Brad H. Bearnson (Bar No. 3633)
Wayne K. Caldwell (Bar No. 9466)
Aaron K. Bergman (Bar No. 13147)
BEARNSON & CALDWELL, LLC
399 North Main, Suite 270
Logan, Utah 84321
(435)752-6300 – Telephone
(435)752-6301 - Facsimile
Email: bbearnson@bearnsonlaw.com
Email: wcaldwell@bearnsonlaw.com
Email: abergman@bearnsonlaw.com
Please cc emails to: bjensen@bearnsonlaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NICOLE SIEGER, for and on behalf of S.S., a minor, | Case No. _____ |
| Plaintiffs, | **COMPLAINT** |
| vs. | **AND** |
| DAVIS COUNTY SCHOOL DISTRICT, a county school district; CASSIE GRETHER, an individual; TRACY NOLAN, an individual; and MARTIN HARDY, an individual, | **JURY DEMAND** |
| Defendants. | |

COMES NOW Plaintiff, NICOLE SIEGER, for and on behalf of S.S., a minor, by

and through legal counsel Aaron K. Bergman and Bearnson & Caldwell, LLC, and hereby

complains against Defendants DAVIS COUNTY SCHOOL DISTRICT, a county school

district; CASSIE GRETHER, an individual; TRACY NOLAN, an individual, and MARTIN HARDY, an individual, as follows:

## NATURE OF ACTION

This is a civil rights action brought pursuant to Title VII of the Civil Rights Act for racial harassment and discrimination. Additionally, this is a breach of contract action seeking damages unique to a settlement agreement entered into between the United States Department of Justice, and the Davis County School District.

## PARTIES

1.    Plaintiff NICOLE SIEGER is an individual residing in Davis County, State of Utah, and is the biological mother of S.S., a minor.

2.    S.S. is an individual and a minor, and resides in Davis County, State of Utah.

3.    Defendant DAVIS COUNTY SCHOOL DISTRICT is a county school district for the county of Davis, State of Utah.

4.    Defendant CASSIE GRETHER is an individual residing in Davis County, State of Utah, and for all relevant times complained of herein is an employee of Defendant Davis County School District.

5.    Defendant TRACY NOLAN is an individual residing in Davis County, State of Utah, and for all relevant times complained of herein is an employee of Defendant Davis County School District.

6.     Defendant MARTIN HARDY is an individual residing in Davis County, State of Utah, and for all relevant times complained of herein is an employee of Defendant Davis County School District.

## JURISDICTION & VENUE

7.     The Court has jurisdiction. See 28 U.S.C. § 1331.

8.     The Court has venue. See 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

9.     Defendant DAVIS COUNTY SCHOOL DISTRICT (hereafter referred to at times as the "DCSD" or the "District") is the second-largest school district in the State.

10.     On September 15, 2021, the United States Department of Justice (hereinafter referred to as times as the "DOJ") issued its Notice of Findings of Race Discrimination in the Davis School District. See DOJ Notice of Findings of Race Discrimination in Davis County (Sept. 15, 2021), attached hereto as Exhibit "A."

11.     The DOJ's findings were extensively supported by:

    a.  over 200 incidents of alleged racial discrimination;

    b.  discipline narratives and student interventions documented from 17 schools during the immediately prior school years of 2017-2018, 2018-2019, and 2019-2020;

    c.  District policies, procedures, handbooks, codes of conduct, and training;

    d.  Five (5) site visits to the District;

e.   Eight (8) district-level interviews;

f.   Seventy (70) school-level interviews;

g.   Student focus-groups held with students at seven (7) junior high and high schools; and

h.   Interviews with additional parents, children, and community members.

12.   The DOJ "found severe, pervasive, and objectively offensive race-based harassment" was regularly committed "in schools across the District" by students against other students.

13.   The DOJ also found "severe, pervasive, and objectively offensive race-based harassment by staff in several District school and services."

14.   The DOJ also found that the District violated the Equal Protection Rights guaranteed to its Black students under the Equal Protection Clause of the Fourteenth Amendment, and these pervasive violations had occurred through the District's "discriminatory enforcement of its codes of conduct and referrals to law enforcement."

15.   As a result of the DOJ's findings of pervasive racial discrimination occurring throughout the District's schools, on October 20, 2021 the United States of America and the District entered into a Settlement Agreement. See *Settlement Agreement Between U.S.A. and Davis School District*, attached hereto as Exhibit "B."

16.   Under the Settlement Agreement, the District promised to "take all necessary and reasonable steps, consistent with Federal law, to end racial harassment, prevent its

recurrence, eliminate any racially hostile environment that currently exists in its schools, programs, and activities, and remedy its effects."

17.     The District agreed to take multiple steps in furtherance of the above promise, including a revamp of its policies and procedures; implementation of vigorous staff training; establishing a new Office of Equal Opportunity department; hiring an independent Consultant to assist the District in complying with Federal law and the Settlement Agreement; designating thirty (30) Coordinators to investigate and respond to racial discrimination complaints; developing a central electronic reporting/complaint management system; developing a complaint procedure; holding yearly reviews that assess the efficacy of the systems, policies, and procedures implemented in furtherance of the Settlement Agreement; issuing school-wide notices to all students, parents, and staff of the District's absolute commitment to creating and maintaining a safe and welcoming environment for all students that is free from harassment and discrimination; and engaging in numerous activities to change the culture of the District into one that is discrimination-free, such as by holding regular assemblies about discrimination; conducting community outreach events; educating students, parents, and the public about discrimination, its effects, and the remedies available; and by collecting bi-annual surveys to assess the prevalence and effect of racial harassment within the District.

18.     Knowing that the above material changes would take time to implement, the District agreed to create an "Interim Plan" which would be submitted to the United States

of America no later than November 1, 2021. Furthermore, the District would "take immediate steps to ensure a prompt and equitable response to racial harassment and other discrimination, and create interim procedures for responding to and tracking incidents of racial discrimination as well as for assuring appropriate accountability for such occurrences.

19.    S.S. is a Black student, attending 9th Grade at the District's Junior High School.

20.    S.S. has historically maintained excellent grades, and is a devoted athlete on the District's swim-team.

21.    Notwithstanding the District's agreement with the Department of Justice, S.S. continued to experience racial harassment by students on a daily basis, being called "cotton picker," being asked to provide the "N-word pass" so students could freely use racially derogative expletives towards him.

22.    In December of 2021, S.S. was attending a school assembly with his fellow students. The District's staff were conducting the assembly, and instructed the students to settle down so that the assembly could proceed. A White student positioned one seat away from S.S., however, continued to be rowdy and would not follow the instruction.

23.    S.S. tapped the White student on his shoulder, and informed the student that he needed to quiet down. In response, the White student swung around, slapping S.S. on the face. A White teacher standing by, Ms. Cassie Grether, witnessed the incident.

24.     Ms. Grether did not approach or remove the White student who had slapped S.S. on the face. Instead, Ms. Grether approached S.S.

25.     On approaching S.S., Ms. Grether informed SS that she would be giving S.S. a "U" (unsatisfactory) Grade for his conduct during the assembly.

26.     S.S. contested, stating the circumstances to Ms. Grether. In response, Ms. Grether acknowledged that she indeed had seen what the White student had done. However, explained Ms. Grether, S.S. should not have been "tapping" another student during the assemble.

27.     In February of 2022, S.S.'s teacher asked him to go see why some of his classmates had not returned from the restroom.

28.     S.S. did as he was instructed.

29.     On reaching the restroom, S.S. found his classmates using illegal substances. S.S. returned to his classroom, and reported what he had seen to his teacher.

30.     Later that day, however, S.S. was accused of having illegal substances, and Tracy Nolan, the school secretary, demanded and searched S.S.'s backpack for contraband. Nothing was found.

31.     The District does not search the backpacks of White students who witness a fellow student using illegal contraband on the premises. Nor does the District automatically assume that a witness White student provided the contraband.

32.     After having his backpack searched, that same day District's Vice Principal Mr. Hardy demanded S.S. come into his office.

33.     On entering Mr. Hardy's office, Mr. Hardy demanded S.S. tell him what S.S. had done with a female student.

34.     S.S. stated that he did not know what Mr. Hardy was talking about. Mr. Hardy pressured S.S., telling S.S. that he was aware of the criminal conduct, upon which S.S. stated that he had kissed the female student, but did not understand why Mr. Hardy was asking him about this.

35.     At this point, Mr. Hardy demanded that S.S. tell him the "rest of the story." S.S. again stated that he did not know what Mr. Hardy was referring to. Mr. Hardy then told S.S. that they had the "whole thing" on video, several times repeating that S.S. should confess, because the incident had been captured on the District's video system.

36.     S.S. repeated, he did not know what Mr. Hardy was talking about. At this point, Mr. Hardy demanded that S.S. write a statement of the incident, handing S.S. a notepad.

37.     S.S. wrote on the notepad that he and the female student had kissed. On writing such, Mr. Hardy demanded that S.S. write down the rest of the story. S.S. informed Mr. Hardy again that there was nothing more that happened, and left Mr. Hardy's office without Mr. Hardy's permission.

38.     Since the above incidents, S.S.'s grades have steadily declined. Also, as a result of the above incidents, S.S. has suffered from severe anxiety and severe stomach aches before going to school each day.

39.     The anxiety and stomach aches became so severe that for several days, S.S. did not attend school.

40.     On confronting the District about Mr. Hardy's allegation that the District possessed video of S.S. engaging in inappropriate conduct with a female student, the District admitted that no such video existed, and expressed confusion as to why Mr. Hardy was even questioning S.S. at all.

41.     The District also assured Ms. Sieger that Ms. Grether's threats would not be followed through with, and that S.S. would not be receiving a "U" for any of his conduct at the school assembly.

42.     Notwithstanding the District's assurances, racially charged expletives continue to occur on a daily basis, and S.S. continues to have stomach aches and anxiety before going to school. Furthermore, Mr. Hardy regularly stares at S.S. as S.S. walks through the halls, causing S.S. to feel even more uncomfortable and threatened.

## FIRST CAUSE OF ACTION
### INTENTIONAL DISCRIMINATION IN VIOLATION OF TITLE VI
(Defendant Davis County School District)

43.     Plaintiffs restate the prior allegations, incorporating them herein by reference as if restated with full force and effect.

44.     Under 42 U.S.C. § 2000d, Title VI of the Civil Rights Act of 1964 broadly but absolutely demands: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

45.     For all times relevant to this action, the Defendant Davis County School District received federal financial assistance, and is subject to and required to comply with the Civil Rights Act of 1964, as amended.

46.     For all times relevant to this action, Plaintiff S.S. is a Black student, attending the District, and is entitled to the protections provided under the Civil Rights Act of 1964, as amended.

47.     In violation of the Act, Defendant intentionally discriminated against S.S. and excluded S.S. from the Defendant's programs, services, and activities.

48.     S.S., a Black student, asked a White student to comply with the District's instructions to quiet down. In response, the White student, who was unwilling to allow reproof by a Black student, slapped S.S. across the face. The White student's conduct was objectively offensive, race-based, student-to-student harassment – the very type of harassment that Defendant had repeatedly let go unchecked. As the DOJ's report found:

> Black students reported strikingly similar experiences throughout the
> District: White and other non-Black students routinely called Black students
> the n-word and other racial epithets, called them monkeys or apes and said

that their skin was dirty or looked like feces. Peers taunted Black students by making monkey noises at them, touching and pulling their hair without permission, repeatedly referencing slavery and lynching and telling Black students "go pick cotton" and "you are my slave." Harassment related to slavery increased when schools taught the subject, which some Black students felt was not taught in a respectful manner. White and other non-Black students demanded that Black students give them an "N-Word Pass," which non-Black students claimed gave them permission to use the n-word with impunity, including to and around Black students. If Black students resisted these demands, they were sometimes threatened or physically assaulted. These incidents took place on a daily or weekly basis.

49.     Similar to the experience of other Black students at the District's schools, the White student was not immediately disciplined. Furthermore, though a teacher was present and witnessed what the White student's racial harassment of S.S., she did not intervene. Instead, almost immediately, the teacher Defendant Grether, who was White, disciplined S.S. having the gall to "tap" on a fellow White student's shoulder. Defendant Grether's conduct, committed in her official capacity as a teacher, was objectively offensive, race-based staff-to-student harassment and discrimination.

50.     Not dissimilarly, in February of 2022 S.S. was blamed for White students' misconduct after he reported seeing the White students using illegal contraband in the school restroom. In response, Defendant Nolan, a White school secretary, searched S.S.'s backpack without cause. Defendant Nolan's conduct, committed in her official capacity as an administrative staff, was objectively offensive, race-based staff-to-student harassment and discrimination.

51.     Compounding the harassment and discrimination S.S. experienced from the baseless search of his backpack, Vice Principal Hardy detained and used false allegations as he repeatedly tried to pressure S.S. to confess to unknown wrongful act against a female, White student. Vice Principal Hardy's conduct was performed in his official capacity, and was in immediate response to S.S. having reported illegal conduct against other, White students.

52.     Such targeting of Black students has been a pervasive, ongoing problem at the District:

> The Department also found severe, pervasive, and objectively offensive race-based harassment by staff in several District schools and services. Students and parents reported incidents in which District staff targeted and assaulted students of color, ridiculed students in front of their peers, endorsed pejorative and harmful stereotypes of people of color in class, and retaliated against students of color for reporting harassment.

49. Vice Principal Hardy's conduct in targeting S.S. in response to a report against illegal conduct by White students was objectively offensive, race-based staff-to-student harassment and discrimination.

53.     S.S. is an upstanding, devoted, and disciplined student of the District. Yet, because of the color of S.S.'s skin, the District repeatedly blamed, accused, and falsely interrogated S.S., simply because S.S. interacted with White students whom the District would prefer to stereotypically assign to someone who is Black.

54.     The District has also continued to allow students to use racially charged derogative phrases and expletives towards S.S., with little to no consequence.

55.     Based upon these incidents, and the preceding findings by the DOJ, the District knowingly created and fostered a racially hostile school environment, whereby the District intentionally discriminated against S.S., because he was Black.

56.     As a result of the District's intentional discrimination, S.S. has been damaged. He has experienced severe anxiety, fear, and humiliation. S.S. has also been excluded from the District's services, programs and activities, missing several days of school; experiencing a drastic decline in grades; and receiving the cold shoulder from staff who used to great him warmly.

57.     The exact quality and amount of S.S.'s damages, both general and special, will be determined later at trial. In addition thereto, Plaintiffs seek their costs, reasonable attorney's fees, prejudgment interest, post-judgment interest, and any other relief the Court deems appropriate under the circumstances.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
(All Defendants)

58.     Plaintiffs restate the prior allegations, incorporating them herein by reference as if restated with full force and effect.

59.     Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, "all persons similarly situated should be treated alike." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018), cert. denied, 139 S. Ct. 800 (2019).

60.     Defendants deprived S.S. of his federal constitutional rights by failing to appropriately and equally apply its disciplinary procedures and policies to S.S., a Black student.

61.     Because S.S. tapped a White student on the shoulder, Defendant Grether threatened to severely discipline S.S. by changing his grade to a "U" for unsatisfactory. Other White students at the assembly tapped students on the shoulder, but they were not disciplined by Defendant Grether or any other of the District's staff.

62.     Because S.S. reported that White students were using drug contraband on school property, Defendant Nolan searched S.S.'s backpack and Defendant Hardy subjected S.S. to a false interrogation. In contrast, when a White student has reported the use of drug contraband on school property, the Defendants do not target the reporting White student, search his belongings, and falsely interrogate the student.

63.     Simply put, the District targeted S.S. for discipline, particularly when such would take the focus away from a White student. Again, as an example, the Vice Principal Defendant Hardy never compelled the White female that S.S. had kissed to answer questions in his office, or subjected her to a false interrogation.

64.     The targeting of S.S. for discipline was not unique. As the DOJ also found in its report: "Students also told us in interviews that administrators and teachers targeted them for discipline . . . [and] were disciplined for behavior that White students also engaged in without consequence." Similarly, "Students and parents reported incidents in which District staff targeted and assaulted students of color, ridiculed students in front of their peers, endorsed pejorative and harmful stereotypes of people of color in class, and retaliated against students of color for reporting harassment."

65.     By targeting S.S. for discipline, fabricating reasons to discipline him, and exercising disciplinary and search powers over S.S. in a manner that was adversely different than that exercised over White students, the District, Defendant Grether, Defendant Nolan, and Defendant Hardy violated S.S.'s right to equal protection under the Fourteenth Amendment.

66.     The exact quality and amount of S.S.'s damages, both general and special, will be determined later at trial. In addition thereto, Plaintiffs seeks their costs, reasonable attorney's fees, prejudgment interest, post-judgment interest, and any other relief the Court deems appropriate under the circumstances.

## THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
(Defendant Davis County School District)

67.     Plaintiffs restate the prior allegations, incorporating them herein by reference as if restated with full force and effect.

68.     Defendant and the United States of America entered into a Settlement Agreement.

69.     The express purpose of the Settlement Agreement was to benefit Black and other non-White students, at Davis County School District, by ensuring that the District would "take all necessary and reasonable steps, consistent with Federal law, to end racial harassment, prevent its recurrence, eliminate any racially hostile environment that currently exists in its schools, programs, and activities, and remedy its effects."

70.     Under the Settlement Agreement, S.S. is an intended beneficiary of the agreement, and is entitled to enforce it.

71.     While much of the Settlement Agreement contemplated overarching and deep systemic changes would take place at the District, the Settlement Agreement nevertheless states that the District would take "immediate steps to ensure a prompt and equitable response to racial harassment and other discrimination, and create interim procedures for responding to and tracking incidents of racial discrimination as well as for assuring appropriate accountability for such occurrences."

72.     The Defendant entered into the agreement on October 20, 2021. Notwithstanding, the District continued to harass and discriminate at every level of its services, programs and activities. In December of 2021, a student was allowed to slap S.S. with no immediate consequence, and Ms. Gerther, a member of the faculty, harassed and discriminated against S.S. without any immediate consequence. In February of 2021, Ms.

Nolan, an administrative secretary, and Vice Principal Hardy, targeted S.S. for misconduct and scoured his personal property and falsely interrogated S.S. without cause.

73.     While the exact details of Defendant's breach are not at this time known, it can safely be said that Defendant did not in good faith and genuinely undertake the interim steps required by the Settlement Agreement. If the Defendant had, then the foregoing instances of ongoing racial discrimination would not have been committed at literally every level of organizational hierarchy (student, faculty, administrative secretary, and upper administrative staff).

74.     Because the Defendant has not appropriately implemented interim rules, policies, and procedures, S.S. has been damaged. Plaintiffs request that the Court compel Defendant to immediately and fully comply with the Settlement Agreement, and to enter such orders as will induce Defendant to implement such interim policies, practices, and procedures so as to ensure the Defendant's continued racial harassment and discrimination comes to an abrupt end.

## JURY DEMAND

75.     In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

The Court should award Plaintiffs with the following relief,

76.     Judgment for general damages and special damages;

77.     Prejudgment and post-judgment interest;

78.     Costs and Plaintiffs' reasonable attorney's fees as permitted by statute, rule, regulation, contract, or equity;

79.     Injunctive relief as to compel and induce Defendant's full compliance with the Settlement Agreement and Title VI of the Civil Rights Act, as amended, particularly as to interim actions, policies and procedures that will ensure the Defendants' continued racial harassment and discrimination comes to an *abrupt* end; and

80.     Any other relief the Court deems just and equitable under the circumstances.

DATED this 22nd day of March, 2022.

BEARNSON & CALDWELL, LLC


/s/ Aaron K. Bergman
Brad H. Bearnson
Wayne K. Caldwell
Aaron K. Bergman
*Attorneys for Plaintiffs*

# EXHIBIT "A"



**U.S. Department of Justice**
Civil Rights Division
Educational Opportunities Section

**United States Attorney's Office**
**District of Utah**

DJ 169-77-26  SS:WP:AV:JJ
USAO:  2019V00231

U.S. Mail:   950 Pennsylvania Ave., NW
                 4CON, Rm. 10.1117
                 Washington, DC 20530
Overnight:  150 M Street, NE,
                 10th Floor, Rm. 1117
                 Washington, DC  20002

September 15, 2021

*By Electronic Mail*

Benjamin Onofrio, General Counsel
Davis School District
45 E. State St.
P.O. Box 588
Farmington, UT 84025-0588

Re:   <u>Notice of Findings of Race Discrimination in the Davis School District</u>

Dear Mr. Onofrio:

We write to provide notice of the results of the United States Department of Justice's ("DOJ" or "the Department") investigation into allegations of race discrimination against students in the Davis School District ("District").  The complaints alleged that the District (1) failed to address widespread race-based harassment of students of color, specifically Black and Asian-American students; (2) disciplined Black students more harshly than white students for comparable behavior; and (3) denied Black students the ability to form student groups while allowing other students to do so.  On the basis of these complaints, DOJ initiated an investigation under Title IV of the Civil Rights Act of 1964 ("Title IV"), 42 U.S.C. § 2000c, *et seq*.

Title IV authorizes the Department to address complaints that a school board is depriving students of equal protection based on race, color, religion, sex, or national origin and to bring civil actions in federal court under certain circumstances.  *See* 42 U.S.C. §§ 2000c-6.  On July 17, 2019, DOJ notified the District that we had opened a Title IV investigation into allegations of racial harassment and other forms of discrimination against students.  In our opening letter and subsequent correspondence, we requested that the District provide information and documents, principally focusing on the period from the 2015-2016 school year to 2019-2020.

In response to eight requests for information issued by DOJ, the District produced, and DOJ reviewed, more than 200 incident files containing allegations of racial harassment and other discrimination.[1]  DOJ reviewed and analyzed discipline narratives and student interventions

---

[1] District officials acknowledged that employees were likely aware of even more racial harassment and discrimination

documentation from 17 schools in the 2017-2018, 2018-2019, and 2019-2020 school years.[2]  DOJ also reviewed relevant District policies and procedures, handbooks, codes of conduct, and trainings.  DOJ analyzed information about the roles and responsibilities of local law enforcement, including School Resource Officers (SROs), in reporting, responding to, and resolving complaints of race-based harassment and discipline within the District.

During five site visits to the District,[3] the Department interviewed eight District-level employees and 70 school-level employees, including principals, assistant principals, administrative interns, guidance counselors, teachers, and ground duties, who supervise playgrounds, hallways, and other common areas.  The Department held focus groups with students at seven junior high and high schools and interviewed additional parents, children, and community members.

During our focus groups and other interviews, Black students reported strikingly similar experiences throughout the District: white and other non-Black students routinely called Black students the n-word and other racial epithets, called them monkeys or apes and said that their skin was dirty or looked like feces.  Peers taunted Black students by making monkey noises at them, touching and pulling their hair without permission, repeatedly referencing slavery and lynching, and telling Black students "go pick cotton" and "you are my slave."  Harassment related to slavery increased when schools taught the subject, which some Black students felt was not taught in a respectful or considerate manner.  White and other non-Black students demanded that Black students give them an "N-Word Pass," which non-Black students claimed gave them permission to use the n-word with impunity, including to and around Black students.  If Black students resisted these demands, they were sometimes threatened or physically assaulted.  These incidents took place on a daily or weekly basis.  Some students, now in middle and high school, said they had experienced racial harassment each year since they were kindergarteners.  Students who attended school in other districts told us that the harassment they experienced in Davis schools was worse by far.

Black students told the Department that incidents happened frequently, at times in front of teachers and other staff, and some would not respond or intervene in any way.  Some students said that they told teachers or other staff when they experienced harassment initially, but when the staff did not respond, the students became discouraged and doubted that staff would ever intervene.  Many Black students said the harassment was so pervasive and happened so often in front of adults that they concluded school employees condoned the behavior and believed reporting it further would be futile.  Some students also said they feared that if they told adults about the racial harassment their harassers would retaliate and the harassment would get worse.  Several said that they disliked attending school and at times missed school because of racial harassment.

Students also told us in interviews that administrators and teachers targeted them for discipline.  Students believed they were disciplined for behavior that white students also engaged in without consequence.  Several Black students also reported feeling that some teachers, most of whom are white, were less welcoming and helpful academically to them in comparison to white

---

reports that were not captured in the District's database "Encore" or other records.  Indeed, various administrators acknowledged that they did not enter all complaints in Encore.  Moreover, administrators admitted they did not maintain many documents, including complaints of racial harassment and other forms of discrimination.  DOJ notified the District that it should retain all documents relevant to this investigation.

[2] Despite repeated requests, the District's production of this information remains incomplete.

[3] DOJ conducted two in-person and three virtual site visits.  In addition, DOJ personnel traveled to Davis County, Utah to meet with and interview complainants and community members.

students.  Black students reported that they wanted access to student organizations similar to those offered to other students that would serve as a forum for discussing and addressing common experiences but their schools had not approved requests for such clubs.

**LEGAL ANALYSIS**

In the context of K-12 education, Title IV authorizes DOJ to address complaints to the effect that a child or children "are being deprived by a public school board of the equal protection of the laws" in violation of their constitutional rights.  42 U.S.C. § 2000c-6(a)(1).  Under Title IV, if DOJ determines that such a complaint has merit, the Department must notify the school district and provide it with an opportunity to voluntarily resolve the matter before filing a lawsuit in federal court.  *See* 42 U.S.C. § 2000c-6(a).  Based on our investigation and as described in greater detail below, we have concluded that the complaints are meritorious.  Specifically, the District deprived students of equal protection by (1) responding in a clearly unreasonable manner to widespread, pervasive race-based harassment of Black and Asian-American students by both students and staff that created a hostile environment and of which it had notice; (2) subjecting Black students to harsher, more frequent discipline than white students who engaged in similar behavior; and (3) denying Black students the ability to form student groups.

## A.  THE DISTRICT WAS DELIBERATELY INDIFFERENT TO KNOWN STUDENT HARASSMENT BASED ON RACE

### 1.  Legal Standard

A school district may violate students' equal protection rights by intentionally discriminating against them as members of an identifiable class or by "consciously acquiesc[ing]" to known harassment by other students or staff.  *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999) (equal protection claim for sex-based harassment).  As courts have observed in private damages cases, a school district acquiesces to harassment based on a protected class when it knows of the harassment but responds in a clearly unreasonable manner— in other words, when it is deliberately indifferent.  *See id.*; *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003) ("Deliberate indifference is found if the school administrator responds to known peer harassment in a manner that is clearly unreasonable.") (citing *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 649 (1999) (internal quotation marks and alterations omitted);[4] *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) ("A finding of deliberate indifference depends on the adequacy of a school district's response to the [racial] harassment.").  A school district that is deliberately indifferent to known student harassment *itself* discriminates in violation of the Equal Protection Clause.  *See Murrell*, 186 F.3d at 1250 ("[T]o state a claim of deliberate discriminatory conduct, [plaintiff] must state facts sufficient to show defendants actually knew of and acquiesced in [the harasser's] behavior.") (internal quotation marks and alterations omitted); *see also Mosavi v. Mt. San Antonio Coll.*, 805 F. App'x 502, 505 (9th Cir. 2020) ("Public school administrators who fail to take protective

---

[4] Although *Davis* dealt with sexual harassment under Title IX, circuit courts, including the Tenth Circuit, have applied the same analysis to find a violation of the Equal Protection Clause when school officials are deliberately indifferent to known harassment.  *See, e.g., Murrell*, 186 F.3d at 1250–51; *Bryant v. Independent Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) (directing district court to apply the Title IX deliberate indifference standard to Title VI claim); *Sturdivant v. Blue Valley Unified Sch. Dist., USD 229*, No. 18-CV-2661-JWL, 2020 WL 3545650, at \*6 (D. Kan. June 30, 2020) (relying on *Murrell* and *Bryant* to find that the deliberate indifference standard is the same under the Equal Protection Clause, Title VI, and Title IX), *appeal docketed*, No. 20-3147 (10th Cir. July 22, 2020); *Doe ex rel. Conner v. Unified Sch. Dist. 233,* No. 12-2285-JTM, 2013 WL 3984336, at \*9 (D. Kan. Aug. 1, 2013) (citing *DiStiso v. Cook,* 691 F.3d 226, 241 (2d Cir. 2012)).  Because the Tenth Circuit applies the *Davis* deliberate indifference standard to Equal Protection claims, we cite generally to cases applying the *Davis* standard.

3

measures against religious harassment may be held liable for religious discrimination in violation of the equal protection guarantees of the . . . federal constitution if a plaintiff can show that the defendants either intentionally discriminated against the plaintiff or acted with deliberate indifference.").

Specifically, in a private suit for monetary damages, a school district must have "actual knowledge" of peer harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Courts have noted that "simple acts of teasing and name-calling among school children" are not considered severe, pervasive, and objectively offensive. *Id.* at 652. In contrast, courts have held that when a student is subjected to racial epithets, threats of violence, and physical assault by their peers, the harassment is considered severe, pervasive, and objectively offensive. In *Bryant*, the Tenth Circuit found a district intentionally discriminated against a Black student when a principal was aware, but took no action when other students used racial slurs; carved "KKK" into desks; placed notes in Black students' lockers and notebooks; wore T-shirts and drove cars to school with the confederate flag, swastikas, KKK insignias, and hangman nooses. 334 F.3d at 931–32 (Title VI claim). In *Bryant*, the student was subjected to the unabated use of the n-word by other students. As the Tenth Circuit explained,

> It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.

*Bryant*, 334 F.3d at 932 (quoting *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) (equal protection and Title VI claims for a racially hostile environment)); *see also DiStiso*, 691 F.3d at 242–43 ("[The] use of the reviled epithet 'n*****,' raises a question of severe harassment going beyond simple teasing and name-calling."). The Second Circuit similarly affirmed a district court's finding of school district liability under Title VI (and upheld a $1 million award) for a student-victim who was, among other things, regularly "taunted, harassed, menaced, and physically assaulted" and whose "peers made frequent pejorative references to his skin tone, calling him a 'n*****' nearly every day." *Zeno*, 702 F.3d at 666–67.

Thus, when a school district is aware of alleged harassment, it must respond in manner that is not clearly unreasonable by taking timely and appropriate action to investigate or otherwise determine what occurred. If an investigation reveals that discriminatory harassment has occurred, the school must respond in a manner that is not clearly unreasonable to address the harassment and hostile environment. *See, e.g., Murrell*, 186 F.3d at 1247–48 (principal's failure to investigate or discipline student who engaged in harassment was evidence of deliberate indifference; teacher's failure to remedy harassment and act of concealing the harassment was evidence of deliberate indifference); *Monteiro*, 158 F.3d at 1034 ("Once on notice of the problem, a school district has a legal duty to take reasonable steps to eliminate a racially hostile environment." (internal quotation marks and citation omitted)). When a school knows "what they had been doing (if anything) had not sufficed[, f]ailure . . . to try something else can show deliberate indifference." *See Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1314 (10th Cir. 2020) (citing *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)) (Title IX claim); *see also Flores*, 324 F.3d at 1135–36. A school district that fails to respond to a known hostile environment intentionally discriminates against its students. *Bryant*, 334 F.3d at 932–33. Indeed, when a school district's employees, particularly its building leaders, choose to take no action when confronted with a racially hostile environment, that "[c]hoice implicates [discriminatory] intent." *Id.* at 33.

This framework applies equally when employees harass students. *See, e.g., Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006) (applying *Davis* and *Murrell* to claim that school was deliberately indifferent to employee's harassment of student). Yet, while courts recognize that "simple acts of teasing" is common among school children, *Davis*, 526 U.S. at 650, teachers who engage in "racial name-calling" create a hostile environment because "a student who faces racial, public denigration by the teacher . . . may reasonably be left with a sense of inferiority relative to her classmates." *Doe v. Los Angeles Unified Sch. Dist.*, No. 2:16-cv-00305, 2017 WL 797152, at *18 (C.D. Cal. Feb. 27, 2017) (equal protection claim for staff-on-student race-based harassment). Indeed, " '[a] sense of inferiority affects the motivation of a child to learn' and may deprive African American students of the educational benefits they would otherwise receive." *Id.* (quoting *Brown v. Bd. of Ed. of Topeka, Kan.*, 347 U.S. 483, 494, (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.,* 349 U.S. 294 (1955)).

## 2.  The District Was Deliberately Indifferent to Known Racial Harassment

### *Student-on-Student Harassment*

DOJ found severe, pervasive, and objectively offensive race-based harassment in schools across the District. Parents and students informed DOJ that white students repeatedly called Black students the n-word despite the District's knowledge and without consequence. *See Monteiro*, 158 F.3d at 1034 ("It goes without saying that being called [the n-word] by your white peers . . . exposes Black children to a risk of discrimination that is so substantial and obvious that a failure to act can only be the result of deliberate indifference." (quotation marks omitted)). We learned of incidents in which white students referred to Black students as dirty, asked why they did not wash their skin, and commented that their skin looked like feces. White students also called Asian-American students pejorative slurs, such as "yellow" and "squinty" and told them to "Go back to China." *See, e.g., DiStiso*, 691 F.3d at 242 (kindergarten students engaged in racial harassment by disparaging a Black boy's race and suggesting that his skin remained dirty even after washing); *Zeno*, 702 F.3d at 667 (pejorative references to student's skin tone was racial harassment). At some schools, white students who called Black students the n-word also wore and displayed confederate flags. *See Bryant*, 334 F.3d at 931–32 (hostile environment created when, among other things, non-Black students wore and displayed confederate flags and used racial slurs). Parents and students across the District told us that these forms of harassment were so commonplace, they expected them to happen. *See Spencer v. Univ. of N.M. Bd. of Regents*, No. 15-cv-141-MCA-SCY, 2016 WL 10592223 at * 4 (D.N.M. Jan. 11, 2016) ("minimalist response," or "where the harasser and other students are left to believe that the harassing behavior has the tacit approval of the school" may show deliberate indifference) (internal quotation marks and citations omitted).

DOJ found that the District was on notice of the racially hostile environment. Although some students told us that continuing to report racial slurs was futile, many parents and students persisted in reporting incidents of racial harassment to teachers, counselors, and school- and district-level administrators. *See id.*; *Davis*, 526 U.S. at 650. The District's documents show it had actual knowledge of at least 212 incidents in which Black students were called the n-word across 27 schools, as well as additional incidents of race-based harassment of Black or Asian-American students.[5]

Finally, we found that the District was deliberately indifferent to the racially hostile climate

---

[5] Because of DOJ's requests for harassment incidents focused on a sampling of schools and the District's incomplete responses, we believe this is a fraction of all such incidents. It also does not include incidents in which students used other racial epithets.

in many of its schools. Despite being on notice of pervasive racially hostile incidents across District schools, frequently the District ignored parent, student, and advocate complaints completely, dismissed them as "inconclusive" even when corroborated by other witnesses, or merely told the harassing student(s) not to do it again, even when the student had harassed Black or Asian-American students previously. *See, e.g.*, *Davis*, 526 U.S. at 645 (finding a school district may be liable for peer-on-peer harassment when its deliberate indifference makes students vulnerable to continued harassment); *DiStiso*, 691 F.3d at 245 (admonishing that no one should argue "that a reasonable response to *repeated* complaints of *repeated* student racial name-calling was to do nothing." (emphasis in original)); *Flores*, 324 F.3d at 1136 (principal was deliberately indifferent to harassment complaint when he investigated some, but not all accused); *Zeno*, 702 F.3d at 669 (when discipline does not deter the harassment, it is deliberately indifferent to proceed with that same response and not more); *Vance*, 231 F.3d at 261–62 (continuing to use efforts that have proven ineffective, such as "talking to the offenders," is clearly unreasonable). At times, the District told Black and Asian-American students not to be so sensitive or made excuses for harassing students by explaining that they were "not trying to be racist." *See Bryant*, 334 F.3d at 932 ("[A] school where [racial slurs and epithets] occur[] unchecked is utterly failing in its mandate to provide a nondiscriminatory educational environment." (quoting *Monteiro*, 158 F.3d at 1034)). Several teachers admitted to hearing students use the n-word,[6] and did not report it to administrators. Their response: telling students to "watch their language." *See DiStiso*, 691 F.3d at 244–45 (reasonable jury could find teacher was deliberately indifferent to complaints of racial harassment where she "offered no evidence that she ever spoke to a kindergarten student about *racial* name-calling" and principal did not conduct "a 'full' investigation" of the incidents and merely spoke to the teacher (emphasis in original)). Likewise, in October 2019, a white student dressed as Hitler for Halloween, marched in a parade throughout his elementary school while performing the Nazi salute, and no school staff stopped him or reported his costume and behavior to school administration.[7]

The District designated a "compliance officer" to receive complaints of racial harassment and to conduct investigations into those complaints.[8] Our investigation revealed complaints of race-based harassment that parents or other staff elevated to the District compliance officer, but the District failed to investigate or otherwise respond to. *See Zeno*, 702 F.3d at 671 (finding district-level civil rights compliance officer's failure to investigate racial harassment complaint clearly unreasonable). The District also improperly relied on an SRO's determination that students

---

[6] Several incidents illustrate District staff's insensitivity to the harm of racial epithets. For example, during one of our focus groups, a Black student reported that he told the assistant principal that a white student called him the n-word. During a discussion about the incident, that assistant principal repeated the word "n***er", in full, to this Black student. *Cf. Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the word 'n***er' is pure anathema to African–Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n***er' by a supervisor in the presence of his subordinates." (internal quotation marks omitted) (citing *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993), *overruled on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Minutes later, the same assistant principal repeated the word to DOJ attorneys. At another school, a teacher told DOJ she intervened upon hearing "two colored people saying they are n***ers." At yet another school, while being interviewed by DOJ's investigative team, a staff member was perplexed at how to describe a Black student's race. She compared the student to a Black attorney on DOJ's investigative team, referring to them both as "colored."

[7] *See, e.g.,* Allyson Chiu, *'Intolerably offensive': Boy's Nazi costume at elementary school Halloween parade sparks outrage,* WASHINGTON POST (Nov. 4, 2019), https://www.washingtonpost.com/nation/2019/11/04/nazi-costume-utah-elementary-school-creekside/.

[8] *11IR-100 Nondiscrimination Policy and Complaint Procedures,* DAVIS SCHOOL DISTRICT POLICIES AND PROCEDURES (Jan. 26, 2016).

should not be criminally charged in deciding not to conduct its own investigation into whether the harassment violated the student code of conduct and the rights of a targeted student. *Cf. Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008) (school districts should not rely solely on prosecutor's decision not to bring criminal case when responding to sexual harassment. In several instances, the District took no action in response to parents' repeated complaints, only to conduct a belated investigation when parents, as a last resort, went to the media. *See Doe*, 2017 WL 797152, at *13 (denying summary judgment where a jury could infer based on "the sequence of events . . . that defendants initially pursued disciplinary action . . . because of media attention . . . and then abandoned the effort when public attention subsided"); *Zeno*, 702 F.3d at 666 ("A failure to respond, a response that only follows after a lengthy and unjustified delay, and a response that amounts to deliberate indifference to discrimination have all been found inadequate." (internal quotation marks, references, and alterations omitted)); *Bryant*, 334 F.3d at 933 n. 3 (school district may be deliberately indifferent for the period between notice and investigation even if it later investigated harassment). As a consequence of this dismissive attitude to serious racial harassment, a District-wide racially hostile environment went unabated.

### Staff-on-Student Harassment

The Department also found severe, pervasive, and objectively offensive race-based harassment by staff in several District schools and services. Students and parents reported incidents in which District staff targeted and assaulted students of color, ridiculed students in front of their peers, endorsed pejorative and harmful stereotypes of people of color in class, and retaliated against students of color for reporting harassment. *See id.* at *18, 20 (district's decision not to discipline teacher who ridiculed student and act of retaliation against a student for reporting staff-on-student racial harassment supported an equal protection claim) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005)).

The District's documents confirm its notice of each incident or earlier incidents involving other complainants that were similar and close in time to later harassment. *See Escue*, 450 F.3d at 1156; *T.Y. v. Shawnee Mission Sch. Dist.*, No. 17-2589, 2018 WL 2722501 at *7–8 (D. Kan. June 6, 2018) (prior episodes of harassment against other complainants constituted notice where the "earlier episodes of harassment were similar, frequent, and close in time to" the alleged assault); *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1286–87 (10th Cir. 2017), *cert. denied*, __U.S. __, 138 S. Ct. 1267 (2018) (prior harassment allegations were sufficiently similar). Our investigation found that the District responded to these incidents in a manner that was clearly unreasonable in light of known circumstances. The Department found that the District disregarded student witnesses who corroborated allegations and took no or minimal action to eliminate the hostile environment. For example, one school received a complaint that a teacher constantly ridiculed a Hispanic student and taunted him for working at a taco truck (though the student did not). An administrator interviewed other students who confirmed that the teacher "openly picks on certain students." Yet, the administrator took no steps to remedy the hostile environment. Where there was a response to harassment or retaliation for reporting harassment, it was "minimalist," *Spencer*, 2016 WL 10592223 at *4, and staff remained in charge of educating or supervising the very students they degraded through racial harassment. In response to one incident, the District's "investigation" was designed to vindicate its staff rather than identify and respond to harassment. *Cf. Murrell*, 186 F.3d at 1248 (teacher's failure to remedy harassment and act of concealing the harassment was evidence of deliberate indifference). As a result, the District left students of color vulnerable to continued abuse. *See Davis*, 526 U.S. at 645. When parents reported a serious incident of physical harassment directly to District officials, those officials took no steps to ensure an appropriate response, and another student was subsequently exposed to a similar incident. *See Zeno*, 702 F.3d

at 671 (where district administrator could "have prompted an earlier and adjusted administrative response," her failure to do so was deliberate indifference).

In addition to our conclusion that the District's response to these incidents was clearly unreasonable, we noted other significant failures in the District's practices. We found that school or department administrators failed to report complaints against staff in violation of District policy. We also found that District officials failed to supervise a department director's investigation into serious allegations of physical harassment that endangered a student, despite longstanding concerns that the director did not follow District policies and protected certain employees from discipline.

Despite widespread student-on-student and staff-on-student harassment, the District did not train administrators or teachers on how to identify and respond to incidents of racial harassment. To date, the District has produced only one administrator training that discussed racial harassment on a single PowerPoint slide and was created after our investigation began. This lack of training in the face of nearly uniform failures to recognize and respond to widespread racial incidents is clearly unreasonable in light of known circumstances. *Cf. id.* at 670–71 (once a district knows of widespread harassment it is clearly unreasonable to continue to use training that does not specifically address racial harassment).

## B.     THE DISTRICT'S DISCIPLINE PRACTICES VIOLATED BLACK STUDENTS' EQUAL PROTECTION RIGHTS

As discussed below, DOJ's investigation concluded that the District discriminated against Black students in its enforcement of discipline policies and practices.

"The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (internal quotation marks omitted) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998)). "[D]isparate impact—while not itself automatically or presumptively unlawful—may well inform a court's investigation into the law's underlying intent or purpose." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 686 (10th Cir. 2012) (J. Gorsuch). Courts have recognized that "[o]fficial conduct is not unconstitutional merely because it produces a disproportionately adverse effect upon a racial minority," but "must ultimately be traced to a racially discriminatory purpose." *Tasby v. Estes*, 643 F.2d 1103, 1107-08 (5th Cir. 1981) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 65-66 (1980) (elections); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (zoning); *Washington v. Davis*, 426 U.S. 229, 239–46 (1976) (public employment); *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 208 (1973) (public schools)).

A plaintiff may establish racially discriminatory intent through direct or circumstantial evidence that a student's race motivated the school officials' actions. *See Vill. of Arlington Heights*, 429 U.S. at 266. Circumstantial evidence can include "comparative evidence of systematically more favorable treatment toward similarly situated [individuals] not sharing the protected characteristic. . . ." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994). In *Bryant*, the Tenth Circuit found that Black students set forth a prima facie case of intentional racial discrimination because "[t]hey alleged that they were suspended after the February 8, 2000, fight while Caucasian students who participated in the fight were not suspended." 334 F.3d at 930 (Title VI claim involving a student-on-student fight). Importantly, the Black students alleged the discipline they received—suspension—was different than the discipline the white students received—no suspension. *Id.* Indeed, disproportionate punishment of Black students may be the

product of a racially discriminatory purpose when it is accompanied by "arbitrary disciplinary practices, undeserved or unreasonable punishment of black students, or failure to discipline white students for similar misconduct." *Tasby*, 643 F.2d at 1108.

The Department collected and analyzed extensive evidence about the District's disciplinary practices. We reviewed examples of disciplinary records of white and Black students who were similarly situated in relevant respects, statistical data on disciplinary practices in the District, statements of District employees, school and District discipline customs and practices, and District training for administrators and teachers responsible for administering discipline. Based on the evidence from our site visits and the analyses of the related data, we concluded that the District has deprived Black students the equal protection of the law through its discriminatory enforcement of its codes of conduct and referrals to law enforcement.

Based on the District's discipline files from the 2017-18 and 2018-19 school years, we found Black students received harsher discipline consequences than white students for similar offenses, even when the students were close in age/grade, had similar records of prior misconduct, were disciplined for the same conduct code violation, and where the narrative descriptions of the misconduct suggested that the incidents were of comparable severity.[9] In several cases, Black students were excluded from class through in- or out-of-school suspensions whereas their white peers received a conference. This is particularly true for offenses such as "disruptive behavior," which requires a highly subjective determination of whether there was a violation of the code of conduct.[10] As a result, Black students missed out on valuable instructional time, which may contribute to or worsen achievement gaps.[11] The Department also found at least one incident in which an SRO charged a Black student criminally while a white student received a conference for similar behavior.

The District has not presented a legitimate explanation for why Black and white students were treated differently under the District's discipline policy and in law enforcement referrals. In fact, during our interviews, District officials admitted to DOJ that the District's discipline data revealed that District staff treated students of color, and in particular Black and Native American

---

[9] As with race-based harassment, our investigation also revealed that when parents and students complained that Black students were disciplined unfairly and targeted because of their race, schools disregarded their complaints. For example, administrators at one elementary school admitted to DOJ that they did not respond to a parent's complaint they discriminated against her son by disciplining him more harshly than his white peers. At another elementary school, we met with a woman who worked as a reading tutor and lunch and ground duty. She told us that she disciplined a Black student, who she called "colored," for talking in the lunch room. The student raised a concern that she targeted him but allowed white students to talk. She told the student she could not be "prejudiced" because her family includes "colored" people. She did not report this allegation to anyone in the school and no one investigated it. The student remained under her supervision at lunch and in her reading group. She received no training on reporting or responding to allegations of discrimination.

[10] Research shows that bias is more likely to play a role in subjective categories of discipline, which involve greater staff discretion because they are harder to define and observe objectively than offenses such as "Possession of Narcotics." *See, e.g.,* JOHANNA WALD, CHARLES HAMILTON HOUSTON INST. FOR RACE & JUST. AT HARVARD L. SCH., CAN 'DE-BIASING' STRATEGIES HELP TO REDUCE RACIAL DISPARITIES IN SCHOOL DISCIPLINE? 2-3 (2014), http://www.indiana.edu/~atlantic/wp-content/uploads/2014/03/Implicit-Bias_031214.pdf; RUSSELL SKIBA & NATASHA WILLIAMS, THE EQUITY PROJECT AT INDIANA UNIV., ARE BLACK KIDS WORSE?: MYTHS AND FACTS ABOUT RACIAL DIFFERENCES IN BEHAVIOR (2014); Michael Rocque & Raymond Paternoster, *Understanding the Antecedents of the "School-to-Jail" Link: The Relationship Between Race and School Discipline*, 101 J. CRIM. L. & CRIMINOLOGY 633, 662 (2011).

[11] Francis A. Pearman II, et al., *Are Achievement Gaps Related to Discipline? Evidence from National Data*, AM. EDUC. RSCH. ASS'N, Oct. 2019, https://journals.sagepub.com/doi/full/10.1177/2332858419875440.

students, differently than white students. Despite knowing for at least four years that discipline data revealed disparities, the District took no steps to train its staff, implement changes to discipline codes and practices, or otherwise take corrective action in light of these disparities.[12] Put simply, the District knew it engaged in discriminatory discipline and did nothing. DOJ's investigation did not find any legitimate basis for the more punitive discipline of Black students when compared to similarly situated white students.

## C.   THE DISTRICT VIOLATED THE EQUAL PROTECTION CLAUSE WHEN IT REFUSED TO ALLOW BLACK STUDENTS TO FORM STUDENT GROUPS WHILE ALLOWING OTHER STUDENTS TO DO SO

Finally, DOJ's investigation found that the District violated the equal protection rights of Black students seeking to form and maintain student groups.

Schools may in some circumstances violate the Equal Protection Clause by denying students the ability to form student groups. *See, e.g., Hudson v. Harris*, 478 F.2d 244, 246 (10th Cir. 1973) (student group may bring equal protection claim where college denied its application to formalize); *E. High Gay/Straight All. v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp. 2d 1166, 1185–86 (D. Utah 1999) (K-12 equal protection claim); *see also Sigma Chi Fraternity v. Regents of Univ. of Colo.*, 258 F. Supp. 515, 529 (D. Colo. 1966) (no equal protection violation where a university resolution treated all student groups similarly and required them all to not discriminate on the basis of race).[13] Decisions to deny students the ability to form student groups must not be motivated by racial animus. *Cf. Yick Wo v. Hopkins,* 118 U.S. 356 (1886) (selective enforcement was purposeful, not merely incidental, discrimination against those of Chinese descent).[14]

Several Black students in the District explained that they want to form student groups because such groups would help them feel less isolated, a part of a common community, and give them a forum to explore their culture, which some said was particularly important as adopted members of white families. Despite documented requests to District schools to form such groups, school officials denied Black students' requests and granted requests by similarly situated non-Black students. District schools sponsor a variety of such groups—from Latinos in Action, a District-sponsored mentoring and community service program for Latinx students that includes a

---

[12] The District launched a Social and Emotional Learning (SEL) initiative to help adults and students "acquire and effectively apply the knowledge, attitudes, and skills necessary to understand and manage emotions, set and achieve positive goals, feel and show empathy for others, establish and maintain positive relationships, and make responsible decisions." DAVIS SCH. DIST., SOCIAL EMOTIONAL LEARNING, https://www.davis.k12.ut.us/departments/student-family-resources/social-emotional-learning (last visited June 15, 2021). The District has devoted significant resources to this initiative and a few administrators said this program addressed discipline disparities; however, the SEL materials produced by the District rarely address race, racial discrimination, or race-based harassment if at all.

[13] The Equal Access Act (EAA), which provides the primary vehicle for challenging schools' decisions to "deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting . . . on the basis of the religious, political, philosophical, or other content of the speech at such meetings," 20 U.S.C. § 4071(a), does not preclude equal protection claims. *See E. High Gay/Straight All.*, 81 F. Supp. 2d at 1185–86.

[14] To be sure, "school districts . . . retain a significant measure of authority over the type of officially recognized activities in which their students participate." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 240–41 (1990) (citing *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988); *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986)). And schools have authority to address situations that "materially and substantially interfere with the orderly conduct of educational activities within the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 509 (1969) (citation and internal quotation marks omitted). But school restrictions on student expression must be justified by more than "undifferentiated fear or apprehension of disturbance." *Id.* at 508.

credited course, to noncurricular, school-based K-Pop Clubs for Korean music and dance enthusiasts. School and District officials offered no legal justification for denying requests from Black students to form such student groups, which would be open to all interested students. One administrator told us that she "didn't think [such a club] was appropriate for school." The same school official told a Black student that the school would only support a "multicultural club." District officials did not help these Black students form student groups, despite a clear and documented need to reduce the experience of racial isolation, which was compounded by the racially hostile climate in District schools. These explanations and offers of alternative groups that were not responsive to Black students' requests are not sufficient to overcome the "grave suspicion" the underlies heightened scrutiny. *See SECSYS, LLC*, 666 F.3d at 687 (state action that "intentionally discriminat[es] against historically ostracized groups—African-Americans . . . , for example—are, experience teaches, so rarely defensible on any ground other than a wish to harm and subjugate that they always come to us under grave suspicion and subject to heightened review.") (citations omitted).

## CONCLUSION

The Department's investigation uncovered systemic failures in the District's handling of complaints of racial student-on-student and staff-on-student harassment, discipline of Black students, and refusal to allow Black students to form student groups. The Department appreciates the cooperation of the District, its administrators, faculty, staff, and students, throughout the course of this investigation and looks forward to continuing to work with the District to resolve all outstanding concerns.

If you have any questions about this letter, please do not hesitate to contact Aria S. Vaughan at aria.vaughan@usdoj.gov or Jadine Johnson at jadine.johnson@usdoj.gov.

Sincerely,

Andrea T. Martinez,
    Acting United States Attorney
Office of the United States Attorney
District of Utah

Shaheena A. Simons, Chief
Whitney M. Pellegrino,
    Principal Deputy Chief
Educational Opportunities Section
Civil Rights Division

EXHIBIT "B"

**Settlement Agreement
Between
The United States of America
And
The Davis School District**

## INTRODUCTION

In July 2019, the United States Department of Justice, Civil Rights Division, Educational Opportunities Section, and the Office of the United States Attorney of the District of Utah (collectively, United States), initiated an investigation under Title IV of the Civil Rights Act of 1964, 42 U.S.C. §2000c *et seq.* (Title IV), into complaints of harassment and discrimination on the basis of race and color in Davis School District in Utah (the District).  These complaints alleged that the District responded inadequately to known student-on-student and staff-on-student racial harassment, subjected Black students to discriminatory discipline, and denied Black students the ability to form and maintain student groups.  Under Title IV, the United States is authorized to address complaints that a school board has denied students equal protection of the laws based on race and other protected classifications.  42 U.S.C. § 2000c-6.  After conducting a thorough investigation, the United States notified the District on September 15, 2021 of the United States' determination that the District had failed to respond appropriately to known harassment of Black and Asian-American students, including frequent racial slurs and epithets, threats of violence, and physical assault by staff and students.  The United States also found that the District disciplined Black students more harshly than their similarly situated white peers and denied Black students equal opportunities to form student groups.  In sum, the District ignored a District-wide racially hostile environment and deprived students of equal protection based on race and color.

The United States and the District (collectively, the Parties) enter into this Agreement to resolve the United States' findings.  The Parties consent to the terms of the Agreement, which includes the Addendum and Appendices.

# TABLE OF CONTENTS

Definitions ................................................................................................................................. 3

I. General ................................................................................................................................. 4

II. Office of Equal Opportunity .............................................................................................. 5

III. Reporting and Responding to Complaints of Harassment and Discrimination ............... 7

IV. Notice on Anti-Harassment and Non-Discrimination ...................................................... 10

V. Culture, Climate, and Community Engagement ................................................................ 11

VI. Policies and Procedures ................................................................................................... 13

VII. Training and Professional Development ......................................................................... 13

VIII. Monitoring and Reporting .............................................................................................. 14

Policy Addendum .................................................................................................................... 16

Appendix A .............................................................................................................................. 22

Appendix B .............................................................................................................................. 24

Appendix C .............................................................................................................................. 26

## <u>DEFINITIONS</u>

### For purposes of this Agreement, the following definitions apply:

- **"Discipline"** refers to any student consequences administered by District staff for student behavior, such as an infraction of a Student Code of Conduct.

- **"Racial harassment"** is unwelcome conduct based on a student's race or color that may include the use of derogatory language (such as racial epithets or jokes) including in images, graffiti, pictures, drawings, notes, electronic mail, social media or electronic postings, or phone messages.  Racial harassment can also include intimidation, threats, unwanted physical contact, or physical violence.  Racial harassment need not include intent to harm, be directed at a specific person, or involve repeated incidents.

- **"Hostile environment"** exists when harassment is objectively offensive and sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the services, activities, or opportunities in the educational program.

- **"Parent"** refers to either or both biological or adoptive parent(s) of a student, a student's legal guardian, or other person legally responsible for a student under state law.

- **"Staff"** includes persons employed by or serving in the District in any capacity including, but not limited to, administrators, administrative interns, teachers, librarians, cafeteria workers, lunchtime monitors, recess monitors, reading partners or tutors, ground duties, teachers' assistants, bus drivers, and school resources officers (SROs).

- **"Student group"** refers to school-based organizations or clubs led by students or a staff sponsor.

## TERMS OF THE AGREEMENT

### I.    GENERAL

1.    The District will take all necessary and reasonable steps, consistent with Federal law, to end racial harassment, prevent its recurrence, eliminate any racially hostile environment that currently exists in its schools, programs, and activities, and remedy its effects.  The District will not discriminate on the basis of race when enforcing student discipline codes and referring students to law enforcement.  The District will ensure Black students have the same opportunity as other students to form and maintain student groups.

2.    The District will identify and hire one or more third-party Consultants (Consultant) agreed upon by the Parties to assist the District to comply with Federal law and this Agreement. Unless otherwise approved by the United States, the District will work with the Consultant for the duration of the Agreement.  The Consultant must have experience in reviewing harassment policies and procedures, analyzing and addressing discipline disparities, and creating trainings to help staff identify, investigate, report, and appropriately respond to incidents of student-on-student and staff-on-student racial harassment or other racial discrimination.  The Consultant may recommend that the District retain additional experts or trainers where needed to meet the requirements of this Agreement and Federal law.

3.    The District will develop a Request for Proposal for a Consultant (Consultant RFP) in accordance with state procurement laws and regulations and District policy.  The District will provide the Consultant RFP to the United States by October 22, 2021.  The United States will provide any suggested revisions by October 27, 2021.  The District will incorporate the suggested changes to the Consultant RFP and will publish the Consultant RFP on October 29, 2021, with responses due by November 24, 2021.

4.    The District will complete technical and written reviews of the Consultant RFP proposals by December 2, 2021, and will compile a list of candidates the District intends to invite for an oral presentation to the District by December 6, 2021.

5.    The District will send the list of candidates to the United States, along with each candidate's Curriculum Vitae and a short description of the candidate's experience with the duties described in Paragraph 2.  If the District proposes to use more than one Consultant to fulfill the terms of this Agreement, the District will delineate the responsibilities for which each Consultant is responsible, including references to the applicable paragraphs in this Agreement.

   a.  If the United States needs additional information about a candidate, including the opportunity to speak with the potential Consultants about their qualifications, the United States will notify the District within 7 days and the District will respond within 7 days of the United States' request.

   b.  The United States will either approve or object in writing to the District's proposed candidate(s) within 7 days of receipt of the list of candidates or receipt of requested additional information (if applicable). If the United States' objects, the District will propose additional candidates within 14 days of notice of the United States' objection.

    c.   On December 13, 2021, the District will invite candidates approved by the United States to provide an oral presentation to the District. Within five days of the oral presentations and prior to selecting the final candidate, the District will notify the United States of its proposed selection, and the United States will notify the District if it has an objection. If the United States has no objection, the District will select the final candidate(s) to be the Consultant by December 20, 2021. The Consultant will officially begin work with the District by January 10, 2022.

    d.   The Parties understand and agree that the deadlines in Paragraph 5.c. may be delayed for the United States' review and approval process described in Paragraphs 5.a. and 5.b.

6.    The District will execute a Memorandum of Understanding (MOU) with each Consultant describing how the Consultant will help the District implement the specific provisions of the Agreement, including by meeting applicable deadlines. At least 21 days prior to executing the MOU (which may be executed after the Consultant has begun work for the District), the District will provide a copy to the United States for review and comment. Each MOU will last the duration of the Agreement unless otherwise agreed by the Parties. The MOU will indicate that the District will provide all information and access necessary to allow the Consultant to assess the District's policies, practices, trainings, staffing qualifications, and District and school culture, and to develop a plan to bring the District into compliance with this Agreement and Federal law.

7.    For the duration of this Agreement, the District may retain additional or alternative Consultants, mutually agreed upon by the Parties, to assist in the implementation of this Agreement, subject to the requirements in Paragraphs 2-3 and 5.

## II.    OFFICE OF EQUAL OPPORTUNITY

8.    By July 1, 2022, the District will create a new department (referred to in this Agreement as Office of Equal Opportunity or OEO) to receive, investigate, and resolve complaints of student-on-student and staff-on-student racial harassment or other racial discrimination and to address any hostile environment related to or arising from such harassment. The OEO will oversee the District's handling of such complaints, conduct outreach to parents, and educate students and train staff on preventing harassment and discrimination and the District's related policies and procedures.[1]

9.    Consistent with Paragraph 10 and in partnership with its Consultant, the District will designate or hire a Director to oversee OEO and to carry out the duties described in this Agreement. The Director of OEO will report to the designated Assistant Superintendent described in Paragraph 25. Candidates considered for the Director position must have specialized training and experience in successfully identifying, investigating, and resolving incidents of student-on-student and staff-on-student harassment; addressing discriminatory policies and practices; and facilitating trainings on creating safe, harassment-free school environments. The selected candidate should have experience reviewing and analyzing discipline data; creating and overseeing remedial plans to

---

[1] While this Agreement relates to racial harassment and other racial discrimination, nothing in the Agreement precludes the District from expanding the central reporting system (*see* Section III), the OEO (*see* Section II), and the District and School Equal Opportunity Coordinator roles (*see* Paragraphs 13-15), to cover additional protected classes and other forms of harassment and discrimination.

redress a hostile environment; and overseeing school-based practices to ensure students have equal access to opportunities.  The District may require additional experience as necessary.

10.     The District will follow its standard hiring process in hiring a Director with the following timeline:

   a.   Develop a job description, in consultation with the Consultant, and provide that description to the United States by January 14, 2022, for review and approval;

   b.   Post the job description by January 28, 2022;

   c.   Create a hiring committee and establish hiring criteria;

   d.   Review applications, select applicants to interview, and submit a list of candidates to the United States for review and comment by February 18, 2022;

   e.   Interview applicants by March 4, 2022.  The District may interview applicants a second time, if necessary;

   f.   The District will request that the Director begin employment on or about April 25, 2022;

   g.   The Parties understand and agree that the deadlines in this paragraph may be delayed if the United States requires more time for its review and approval process.

11.     By December 1, 2021, the District will assemble a committee (OEO Committee) to work with the Consultant on the tasks described in Paragraph 12.  The OEO Committee will include members of the existing District Equity Committee, District employees, and at least one School Board member.  The OEO Committee will be led by a District Equity/OCR Compliance Officer, who will also be the liaison with the Consultant. The District will provide to the United States for review and approval the names, organization, and position of proposed OEO Committee members by November 12, 2021.  The United States will raise any concerns with the District by November 19, 2021.

12.     During the 2021-2022 school year, the OEO Committee, in consultation with the Consultant, will oversee and further the District's efforts to: develop an electronic system for reporting and responding to complaints of racial harassment and discrimination as described in Section III of this Agreement; improve culture, climate, and community engagement as described in Section V of this Agreement; develop policies and procedures as described in Section VI of this Agreement; and implement training and professional development as described in Section VII of this Agreement.

13.     By March 1, 2022, the designated Assistant Superintendent described in Paragraph 25, in consultation with the Consultant and OEO Committee, will designate or hire at least three, full-time District-level staff members to work in OEO to oversee the District's compliance with this Agreement and Federal law (District Equal Opportunity Coordinators or District Coordinators). After providing appropriate training, the District may elect to transfer current Compliance Officers to serve as District Equal Opportunity Coordinators supervised by the OEO Director.  If, over time, the Director or Consultant determines that additional staffing resources are needed, the District will either transfer or hire additional staff to ensure compliance with this Agreement and Federal law.

6

14.     District Equal Opportunity Coordinators will investigate, respond to, and oversee handling of complaints of racial harassment and other racial discrimination affecting students. The District will develop procedures to determine which student-on-student complaints should be investigated by a District Coordinator or a School Coordinator (*see* Paragraph 15). The District's Department of Human Resources will investigate staff-on-student complaints in collaboration with the Director of OEO and District Coordinators.

15.     By July 1, 2022, the District will designate 30 School Equal Opportunity Coordinators (School Coordinators) who will work closely with OEO staff to investigate and respond to all complaints of student-on-student racial harassment and other racial discrimination (including discriminatory discipline) that are not elevated to a District Coordinator (*see* Appendix C). The District will select elementary and secondary school staff members who have demonstrated a commitment to racial equity and who have effectively addressed incidents of racial harassment or other racial discrimination within their schools. Elementary School Coordinators will oversee handling of complaints at no more than 4 elementary schools. Secondary School Coordinators will oversee handling of complaints at no more than 3 junior high or 2 high schools.

   a.   Before selecting School Coordinators, the District will submit its recommendations for each position to the United States for review and comment.

   b.   Selected staff will assume School Coordinator duties in addition to their existing job duties, and the District will allocate an annual stipend to each School Coordinator. The term for School Coordinator will be at least two years.

   c.   The specific duties of the District Coordinators and School Coordinators are outlined in Appendix C.

16.     Within 60 days of hiring its Consultant and no later than February 15, 2022, the District and its Consultant will draft and send to the United States for its approval a detailed plan with a proposed timeline for creating OEO, description of the Office's mission and goals, proposed allocation of responsibilities over complaints, list of current staff members who will be moved to OEO (if any), recruitment plan for identifying candidates for the District and School Coordinator positions, and qualifications for each position and role (OEO Launch Plan). The United States will review and comment on the District's plan. If the District does not adopt the United States' recommended changes, it will provide a written explanation.

17.     Until the policies, procedures, and systems outlined in Sections III and VI of the Agreement have been adopted and implemented, the District will take immediate steps to ensure a prompt and equitable response to racial harassment and other discrimination, including: training for students, staff, and administrators on how to report and respond to racial harassment and other discrimination; interim procedures for responding to and tracking incidents of racial harassment and other discrimination; and accountability mechanisms (Interim Plan). The District will submit its Interim Plan to the United States for review and comment by November 1, 2021.

## III.   REPORTING AND RESPONDING TO COMPLAINTS OF HARASSMENT AND DISCRIMINATION

18.     By April 30, 2022, the District will develop a central electronic reporting/complaint management system to receive, track, and manage all complaints or reports of racial harassment and other racial discrimination, including complaints made through SafeUT, to SROs, and race-based

incidents recorded in the context of discipline entries (e.g., when a student is disciplined for fighting and the student describes racial harassment preceding the fight).  By the start of the 2022-2023 school year, the District will use this system to record its response to such complaints and communications with complainants, witnesses, and staff or students alleged to have engaged in harassment.  The central reporting system will: integrate the District's student information system to allow for inter-departmental coordination; generate data and reports; allow users to create timelines to guide the District's responses to complaints; track staff's compliance with District complaint response procedures; and generate letters to complainants, witnesses, or students or staff alleged to have engaged in harassment notifying them of the District's findings and conclusions. The District will ensure that the central reporting system complies with the Americans with Disabilities Act and the Family Educational Rights and Privacy Act.

19.     The District will deploy a complaint portal linked to the central reporting/complaint management system that allows individuals (including parents, students, staff, and community members) to submit complaints of discrimination and harassment electronically.  The complaint portal must be accessible from links on District and school websites, by computer or mobile device, and must be accessible to students and families with disabilities or limited English proficiency.

    a.  The complaint portal will request information about the complainant, the student subjected to the racial harassment, and the students or staff alleged to have engaged in harassment, including names, grades or position/title (if applicable), school, and race/ethnicity.  The complaint form will also request the names of witnesses; when the alleged conduct took place and if it is ongoing; the location(s); the names and position/title of any District staff with knowledge of this incident or previous incidents involving the same student(s); whether the complainant or student subjected to the harassment fears retaliation and if so, from whom; and a description of the conduct/events.

    b.  The system will accept and the District will respond to anonymous and incomplete reports, but the District will encourage complainants to share their names and the names of those involved to ensure the District is able to effectively investigate and respond.

20.     Within 10 days of receipt of a complaint, the designated District or School Coordinator will enter a detailed summary of actions taken in response to the complaint into the central reporting system, including, but not limited to: a summary of interviews with the staff or students alleged to have engaged in harassment or the student subjected to the harassment; names of witnesses and a copy of witness statements; a summary and copies of physical or electronic evidence (e.g., screenshots, security video footage); the outcome of the investigation (e.g., whether the harassment occurred); and the remedial or disciplinary response (if any).

21.     The District will maintain all records of complaints of student-on-student and staff-on-student racial harassment, including all electronic and paper records, for at least five years from the date of the complaint.  The District will update its document retention policy accordingly and disseminate the updated policy to all school staff.

22.     The District will develop procedures to timely, appropriately, and effectively respond to each complaint consistent with this Agreement and Federal law (Complaint Procedures).  This will include procedures to monitor the central reporting system and notify relevant staff.  With input

from its Consultant, the District will submit the Complaint Procedures to the United States for review and approval by March 31, 2022.  The Complaint Procedures will require, at a minimum:

    a. OEO Director and the District Coordinators to receive automated copies of every complaint;

    b. Other relevant staff and departments to receive automated copies of complaints;

    c. At least one District Coordinator assigned to oversee handling of each complaint filed in the central reporting system;

    d. A process for assigning complaints to a School Coordinator or District Coordinator to investigate consistent with the duties in Appendix C; and

    e. For complaints that allege harassment or discrimination based on race and another protected class, coordination between the District Coordinator and the appropriate compliance officer(s) to address the other allegations.

23.     The Complaint Procedures will include procedures to identify incidents of racial harassment in District schools that occurred since August 2017 that staff categorized as other forms of misconduct (e.g., profanity).  These procedures will include a process for reviewing, at a minimum, discipline data, police reports filed against staff members with SROs or local police departments, SafeUT reports, and other student information databases.  The procedures will also specify that every incident of racial harassment identified through this process will be reported to the Director of the OEO and District Coordinators, and if the incident involves staff, the Director of Human Resources, who will promptly, appropriately, and effectively respond and take corrective action to ensure future incidents of racial harassment are reported in the central reporting system.

24.     Starting in October 2021 and then monthly throughout the 2021-2022 school year, the District Equity/OCR Compliance Officer will meet separately with the Elementary and Secondary School Directors and the Director of Human Resources to review student-on-student and staff-on-student racial harassment complaints, respectively, received in the previous quarter. Starting in September 2022 and then quarterly thereafter, these meetings will take place with the Director of OEO, the District Coordinators, and the Consultant. Participants in these quarterly meetings will discuss: promising practices, trends in harassing conduct (e.g., specific groups subjected to harassment, repeat staff or students alleged to have engaged in harassment, repeat students subjected to harassment, type or location of harassment); concerns with the effectiveness and impartiality of investigations or the District response; need for additional student support or staff training; retaliation concerns; and any accessibility barriers to students, parents, and staff using the reporting system.  The Director of Human Resources will refer staff to the ACT disciplinary committee as appropriate.

25.     Starting in October 2021, the District Equity/OCR Compliance Officer will meet with a designated Assistant Superintendent each month of the first year of the Agreement, and quarterly thereafter, to assess the District's progress in implementing the terms of this Agreement. Starting in September 2022, these meetings will take place with the Director of OEO and the District Coordinators. The OEO Director and District Coordinators will summarize the practices, trends, and concerns raised during the meetings described in Paragraph 24 and discuss any needs for additional assistance or resources.  The District will document the substance of these meetings through agendas and meeting notes and retain such documents for the duration of the Agreement.

26.     At the conclusion of each school year, the District will assess the effectiveness of its anti-harassment and non-discrimination efforts (Effectiveness Assessment Report). The Assessment will be conducted by the Director of OEO and the Consultant and will include analysis of whether the District has made any progress on the items identified in Appendix B.  The Assessment will also include steps the District will take to improve its effectiveness in the next school year.[2]  The District will submit the Report to the United States by July 1 each year.

## IV.   NOTICE ON ANTI-HARASSMENT AND NON-DISCRIMINATION

27.     Within 30 days of the effective date of this Agreement, the Superintendent and School Board will issue a District-wide notice to all students, parents, and staff stating the District's commitment to creating and maintaining a safe and welcoming environment for all students that is free from harassment and discrimination.  The notice will describe the District's duty to promptly and appropriately investigate and resolve any complaints of discrimination, including harassment on the basis of race, and will require staff and encourage students and parents who believe a student was subjected to racial harassment or other racial discrimination to file a complaint or report it to the District Equity/OCR Compliance Officer.  The notice will also include a link to this Agreement and a summary of the Agreement (Agreement Summary), which will be posted on the District website. Within 7 days of the effective date of this Agreement, the District will submit this notice to the United States for review and comment.  The United States will approve or provide any edits or comments within 14 days of receipt.

28.     Within 7 days of the start of each subsequent school year, in collaboration with the Consultant, the Superintendent and School Board will issue a District-wide notice to all students, parents, and staff stating the District's commitment to creating and maintaining a safe and welcoming environment for all students that is free from harassment and discrimination.  The District will send the notices directly to parents, students, and staff via letter mail and electronic mail and publish it on the District's website homepage, social media pages, in the Central Office, and the Student Code of Conduct.  The District will make the notices accessible to students and families with disabilities or limited English proficiency.

29.     The notice will describe the District's duty to promptly and appropriately investigate and resolve any complaints of discrimination, including harassment on the basis of race, and will require staff and encourage students and parents who believe a student was subjected to racial harassment or other racial discrimination to file a complaint or report it to the District Coordinator. The notice will inform students, parents, and staff that:

   a.  the District has a dedicated department to receive, investigate, and resolve complaints of student-on-student and staff-on-student racial harassment or other racial discrimination, and to address any hostile environment related to or arising from such harassment;

   b.  the District's complaint form and central reporting system allow students, parents, and staff to submit complaints and school and District leaders to track complaints of harassment or other racial discrimination;

---

[2]An initial increase in the number of complaints received does not necessarily indicate that efforts have been ineffective.  Expanding access to filing complaints often results in increased reporting.

  c. the District will conduct a prompt and thorough investigation into any complaints of racial harassment, discrimination, or retaliation;

  d. the District has created an appeal process;

  e. starting in the 2022-2023 school year, and then each semester, the District will host multiple outreach events at schools across the District to explain the new policies, procedures, and supports to students and families (*see* Paragraph 32.a.); and

30. This Agreement and the Agreement Summary will be posted on the District website. The District will submit the draft notice to the United States for review and approval at least 30 days before publishing. The United States will approve or provide any edits or comments within 21 days of receipt.

## V. CULTURE, CLIMATE, AND COMMUNITY ENGAGEMENT

31. The Director of OEO and the Consultant will develop a plan to engage students, parents, and community members in the District's efforts to create discrimination- and harassment-free learning environments for all (Engagement Plan). The District will solicit input from diverse groups of students when developing the Engagement Plan and include opportunities for students to take leadership roles in activities or events.

32. The Engagement Plan will require the District to inform students, parents, and community members about its efforts to address racial harassment and other racial discrimination. To that end:

  a. Each Elementary and Secondary School Director along with the Director of OEO and the District Coordinators will host outreach events and assemblies on the District's harassment and discrimination policies. The sessions will cover, at a minimum: how to report harassment; how to report concerns regarding discipline and referrals to law enforcement; what to expect during an investigation; potential consequences and remedies; how to start a student group; the differences between bullying and racial harassment; and other information on student and parent rights (e.g., presenting evidence, due process, and appeals).

  b. The District's existing Equity Committee, which will be part of OEO, will continue to meet on a regular basis, and at each meeting the Director of OEO, or a designee, will summarize the District's handling of discrimination and harassment complaints, analysis of discrimination in the administration of discipline, and any requests to form student groups.

  c. Within 20 days after producing the annual October 1 report to the United States, the District will publish the information in Sections A-2(a)-(b), A-3(b), and A-5(a) of Appendix A annually on its website, redacting any personally identifiable information, race/ethnicity identifications, or other protected information.

33. The District will submit the proposed Engagement Plan to the United States for review and comment by July 1, 2022, for the 2022-2023 school year and 14 days before the first day of school each subsequent year.

34.     By May 27, 2022, the District, in collaboration with the Consultant, will send to the United States for approval a plan to improve school culture and climate (School Culture and Climate Improvement Plan).  The plan will include an assessment of: the current school climate; the prevalence of racial harassment, discriminatory discipline including referrals to law enforcement, and other discrimination; and the impact of any such discrimination on students and the overall school environment.  At a minimum, the District's plan will identify steps to further the following goals, staff who will help further the goals, and any additional resources needed to:

      a.   Address racial harassment and the discriminatory administration of discipline;

      b.   Develop clear procedures for how students can apply to start student organizations, including rules for organizations;

      c.   Provide specialized counseling to students who have experienced trauma from racial harassment and hostile environments; and

      d.   Consider ways to increase representation of diverse students and staff in District materials, groups, programs, initiatives, and activities.

35.     Each year, the District will work with the Consultant to provide age-appropriate bullying and harassment intervention programming to all District students that covers the type of conduct prohibited by District policy and the processes for notifying school staff of incidents of harassment.

36.     The District will work with the Consultant to develop and administer two annual surveys.  These surveys will assess the prevalence and effects of racial harassment and other racial discrimination, the inclusiveness and safety of the educational environment, and the effectiveness of the measures taken pursuant to this Agreement.  The District will administer one to students, and the second to parents of District students. The District will make both surveys accessible to students and families with disabilities or limited English proficiency.  The surveys may be completed anonymously.

37.     Starting in the 2022-2023 school year and for each school year throughout the term of this Agreement, the District will administer the student and parent surveys prior to November 1.  The District will submit draft surveys to the United States for review and additional input at least 45 days prior to their administration.  The Director of OEO and District Coordinators will analyze the results of the surveys and incorporate this analysis into the District's annual Effectiveness Assessment Report, described in Paragraph 26.  If either the District, the United States, or the Consultant determine that training is needed on how to analyze survey results, the District will provide such training to relevant staff.

38.     Starting in the 2022-2023 school year, the Director of OEO and the Consultant will convene secondary school student focus groups for at least 13 secondary schools (or half of the District's secondary schools) each year in October and April.  The District will work with the Consultant to develop the focus group questions and will submit the draft questions to the United States for review and comment at least 60 days prior to their administration.  The Director of OEO and District Coordinators will analyze the focus group results and incorporate this analysis into the District's annual Effectiveness Assessment Report.

39.     Each year, the Consultant will present the results from the student and parent surveys and student focus groups and recommended next steps to the School Board.  The School Board will make every effort to implement all of the recommendations.

## VI.     POLICIES AND PROCEDURES

40.     In partnership with the District, the Consultant will review and assess all District- and school-level policies, practices, and procedures related to racial harassment and other race-based discrimination, including student discipline, and all related materials (e.g., student and staff handbooks, student codes of conduct, ethical standards for staff, staff discipline policies).

41.     By March 25, 2022, the Consultant will provide the District with a Report and Recommendations to ensure that District policies and practices are consistent with this Agreement and Federal law to prevent, investigate, and respond to racial harassment and other racial discrimination (Consultant Policy and Procedure Report and Recommendations).  The Report and Recommendations will include recommended changes to school- and District-level policies and procedures and will identify what resources the District needs to allocate to fully implement the changes.

42.     Within 7 days of receiving the Consultant Policy and Procedure Report and Recommendations, the District will submit the report to the United States for review and comment.

43.     By April 29, 2022, and before submitting to the School Board, the District will submit to the United States its proposed revisions to District- and school-level policies and procedures with a detailed explanation of how OEO and other departments and programs will implement the policies and procedures (District Policy Revisions).  The District Policy Revisions will include the District's proposed policies to address: (a) racial harassment; (b) discriminatory administration of school discipline; and (c) discriminatory access to student groups.  The District Policy Revisions will cover these topics and the specific requirements for each topic described in the Policy Addendum.  The United States will provide comments within 45 days.

## VII.    TRAINING AND PROFESSIONAL DEVELOPMENT

44.     The District will work with the Consultant to review, revise, and implement trainings on preventing and addressing racial harassment and discriminatory discipline practices, consistent with best practices and the terms in this Agreement.  The District will work with the Consultant to develop an annual training program for all staff who interact with students (Professional Development Program).  The District and Consultant will determine which trainings are required for specific staff and the format and timing for each training.  Each staff member should complete all trainings identified as mandatory by the Consultant by August 20, 2022, for the first year of the Agreement and by June 1 for subsequent years.  The District will ensure that any staff who miss a required training, including new hires, will receive the training in a timely manner.  The District will annually reevaluate its Professional Development Program based on review of feedback from participants, its Consultant, and the United States, and relevant data in Appendices A and B.

45.     The Professional Development Program will include a series of instructor-led trainings and smaller school- or department-level workshops to teach staff how to identify, report, and respond to racial harassment and foster a safe and nondiscriminatory educational environment. All trainings will be led by qualified instructors and will cover the topics in the Policy Addendum, at a minimum.

46.     By March 31, 2022, the District will send the Professional Development Program to the United States for approval.  The Program will include a description of how the District will develop trainings and materials to cover topics in the Policy Addendum.  The United States will provide any feedback, edits, or comments on the Professional Development Program within 45 days.

47.     By June 1, 2022, the District and Consultant will develop and send to the United States the "Priority School and Priority Staff Assistance and Training Program" including all outlines and materials for targeted trainings and assistance for staff and schools where data indicates that particularized training and support are required on administering discipline in a nondiscriminatory manner.  The District will identify "Priority Staff" and "Priority Schools" under the guidelines in the Policy Addendum.  The trainings, which will begin in the 2022-2023 school year, will be tailored to focus on the specific areas of need as identified by the Director of OEO and Consultant.

## VIII.   MONITORING AND REPORTING

48.     For the duration of this Agreement, the District will submit to the United States bi-annual reports in electronic format detailing its efforts to comply with this Agreement.  The District will, for the duration of this Agreement, preserve and maintain all records and documents, including all electronically stored information used to compile the annual report, and all other documents relevant to its compliance with this Agreement.

   a.  By October 1 each year, the District will provide the information contained in Appendix A for the current school year.

   b.  By July 1 each year, the District will provide the information contained in Appendix B for the school year that just ended.

49.     The United States may request other information and documents reasonably related to the monitoring of this Agreement and the District's compliance with this Agreement and Federal law.  The District will respond to all requests within 30 days unless otherwise agreed upon by the Parties.

50.     The United States will inform the District in writing of any concerns regarding the District's compliance with this Agreement or relevant Federal law.  The Parties will act in good faith to resolve any issues or concerns.  The District understands and acknowledges that, in the event of a material breach by the District of this Agreement that cannot be resolved through good faith negotiations, the United States may initiate judicial proceedings under Title IV and the terms and obligations of the District under this Agreement.  This Agreement does not relieve the District from its other obligations under other Federal laws.  The United States retains the right to investigate and, where appropriate, initiate enforcement proceedings concerning any future alleged violations of Federal law by the District.

51.     For the purposes of monitoring this Agreement, the United States, through its representatives and any consultant or expert it may retain, has the right to: conduct site visits; interview staff and students (with parent permission); observe trainings, workshops, and student focus groups; review and inspect the central reporting system; and request additional information or data as necessary for the United States to determine whether the District has fulfilled the terms of this Agreement.  The United States may speak directly, without District counsel, with District Consultant and staff members who are not administrators and who have questions, concerns, or

other information to share with the United States regarding the District's obligations under this Agreement and Federal law.  The District will not retaliate against staff, parents, or students, who participate in the United States' investigation, monitoring, and enforcement of this Agreement.

52.     The District Coordinators will create quarterly reports for the meetings with the Director of OEO and Assistant Superintendent (*see* Paragraph 25) describing the school- and District-level compliance progress with the terms of Agreement and areas in need of improvement. The quarterly reports will also include:  a summary of the racial harassment complaints received and the District's response (flagging the complaints that may need additional support or resources); an analysis of discipline data, including an assessment of discrimination in the administration of discipline; requests by students of color to form student groups and schools' responses; and any other barriers to students of color accessing District services and programs.  The District will forward all reports to the United States within 7 days of receipt.

53.     By July 1, 2023, and on July 1 each year thereafter, the Director of OEO, District Coordinators, and Consultant, will conduct a multi-year review of the District's progress in responding to complaints of racial harassment and addressing discriminatory disciplinary practices, including analysis of the Effectiveness Assessment Reports (*see* Paragraph 26) from the previous school years and other analysis as determined by the United States, to evaluate the effectiveness of its efforts towards meeting the terms of this Agreement (Longitudinal Effectiveness Assessment Report).  The Parties will meet to discuss the results of this review and any concerns.

54.     The Parties agree that all Appendices and Addendums are enforceable parts of this Agreement.

55.     If any part of this Agreement is for any reason held to be invalid, unlawful, or otherwise unenforceable by a court of competent jurisdiction, such decision shall not affect the validity of any other part of the Agreement.  The District and United States will meet within 15 days of such decision to negotiate in good faith whether the Agreement should be revised or supplemented in response to the court's decision.

56.     This Agreement will remain in effect until the United States determines that the District has complied fully with its provisions and its obligations under the Equal Protection Clause.  The Parties anticipate that the District will achieve compliance after it submits its annual report in July 2025.  The United States will notify the District of any compliance-based objection within 90 days of receiving the July 2025 report and the District will make a good faith effort to address those objections within a reasonable period of time and will negotiate modifications of the Agreement to address objections that cannot be resolved within 60 days.  At any point during the term of the Agreement, the Parties may, upon mutual written agreement, extend or amend this Agreement.

## POLICY ADDENDUM

57.     As described in Paragraph 43, by April 29, 2022, the District will submit to the United States its proposed revisions to District- and school-level policies and procedures (District Policy Revisions) to appropriately address (a) racial harassment; (b) discriminatory administration of school discipline; and (c) discriminatory access to student groups consistent with the terms of this Agreement and Federal law.

a.  To prevent, investigate, and address racial harassment, the District Policy Revisions will, at a minimum, include proposed policies on:

1.   Racial Harassment. The District will define racial harassment and a racially hostile environment and include examples of student-on-student and staff-on-student conduct that meets these definitions. The District will explain how such conduct impedes student access to services, programs, or activities in the educational program. The District will explain the difference between bullying as defined in the District's bullying policy and racial harassment, and clarify what is covered under each policy.

2.   Complaint Intake Process. The District will develop complaint intake procedures for students, parents, and staff to ensure that allegations of racial harassment are promptly and accurately reported through the central reporting system.  The procedures will specify the multiple ways that individuals can report incidents of racial harassment (including, but not limited to, an oral or written report or complaint, through the central reporting system, or to staff) and the procedures staff will use to receive and document complaints.  The District will describe how staff will enter complaints into the central reporting system.

3.   Staff Reporting Process. The District will require staff to report all incidents of alleged racial harassment, including incidents they witness or learn of from a student, parent, third party, or another staff member, regardless of whether the staff member witnessed the incident.  District policy will ensure the complaints are promptly, appropriately, and effectively investigated and resolved.  The District will describe its procedures for reporting oral complaints (where the reporting individual describes the incident, but does not submit a written complaint), anonymous complaints, and complaints from witnesses or third parties.  The District will provide clear guidance on how to file a report when the student subjected to the harassment is unknown (e.g., graffiti or social media post) or the incident occurs off-campus but has a continuing effect on the school environment.

4.   Student Reporting Process. The District will develop a process so that students who experience, witness, or learn of potential harassment can report such incidents, using age-appropriate reporting methods, such as the central reporting system, verbal, and written complaints.

5.   Investigations of Student-on-Student Harassment. The District will develop procedures on how staff will investigate complaints of student-on-student racial harassment, including how to: communicate with affected parties using trauma-informed interviewing skills; gather information; interview witnesses; respond to off-campus conduct that has a continuing effect on District programs and activities; apply the

standard of evidence; make findings, retain records; and resolve complaints in a timely, appropriate, and effective manner.

6.  <u>Investigations of Staff-on-Student Harassment</u>.  The District will develop procedures on how the District will investigate complaints of staff-on-student racial harassment, including complaints submitted by students, parents, and community members through the central reporting system or to the District Coordinator.  The procedures will address the role of Human Resources and the ACT disciplinary committee.  The District will require staff to report incidents of alleged staff-on-student racial harassment in the central reporting system or by directly notifying the Director of Human Resources.

7.  <u>SRO or Law Enforcement Involvement</u>.  The District will include procedures that define the limited circumstances when it is appropriate for SROs or law enforcement officers to be involved in an investigation of racial harassment or other racial discrimination, how to minimize unnecessary interactions between students and SROs, and how the District will coordinate with SROs or law enforcement in any situations of alleged harassment or abuse by District employees.

8.  <u>Protection from Retaliation</u>. The District will investigate and respond to incidents of retaliation for filing a complaint or participating in an investigation using the same process it uses for racial harassment.  The District will make every effort to protect students and staff who experience retaliation in response to filing a complaint or participating in an investigation related to an incident of racial harassment.

9.  <u>Central Reporting System</u>. The District will include a procedure for creating, managing, and monitoring the central, electronic reporting system.

10. <u>Immediate Safety Measures</u>. The District will develop procedures requiring the designated District or School Coordinator to determine within 2 days of receipt of a complaint the need for interim safety measures to protect the safety of the complainant, student subjected to the harassment (if not the complainant), or witnesses; put such measures in place as needed; and monitor their effectiveness.

11. <u>Notice</u>. The District will develop procedures to send all complainants, students subjected to harassment (if not the complainant), and staff or students alleged to have engaged in harassment notice of: the complaint; information regarding the investigation process, including the person's right to submit evidence and an estimated timeline; District findings (whether or not the alleged conduct occurred); the actions the District will or will not take in response; and their right to appeal.  The District will send notices addressed to students to the student's parent in a language the parent understands.

12. <u>Remedial and Disciplinary Measures</u>. The District, in collaboration with the Consultant, will assess the District's remedial measures to determine if they are trauma-informed, victim-centered, research-based, and effective at preventing future harassment and creating a safe environment free from hostility and discrimination.  The District and Consultant will work to develop new remedial measures aimed at improving the District's climate and culture and preventing incidents of racial harassment.

13. <u>Monitoring</u>. The District will create a process for monitoring the District's compliance with the District's non-discrimination policies and procedures, including ensuring that staff and students complete remedial measures instituted to remedy harassment or discrimination.  District and School Coordinators will periodically review the District's response to complaints of racial harassment to ensure it was timely, appropriate, and effective.

14. <u>Appeal Process</u>. The District will develop an appeal process for students and their parents to appeal the District's response to complaints of racial harassment.  All appeals will be forwarded to the Director of OEO and the Superintendent.  The District will notify students and their parents of the right to appeal and provide an opportunity to be heard, including to explain why the District's response was insufficient, ineffective, unfair, or did not address ongoing safety concerns.

15. <u>Appeal Board</u>. The Director of OEO will appoint a panel of at least three individuals to hear appeals.  Staff interested in serving on the Appeal Board must demonstrate their impartiality and commitment to creating and maintaining a safe and welcoming environment for all students that is free from harassment and discrimination.  The Director of OEO will ensure all members of the Appeal Board receive additional training on how to conduct appeals in a thorough, impartial, and fair manner.

b. To address and remedy the discriminatory administration of student discipline, the District Policy Revisions will, at a minimum, include proposed policies on:

1. <u>District-wide Student Code of Conduct</u>.  The District, in consultation with the Consultant, will develop a District-wide Student Code of Conduct that: states that the District will not tolerate discrimination on the basis of race when enforcing the Student Code of Conduct including its law enforcement referrals; describes available alternatives to exclusionary discipline; explains that staff must use interventions and corrective practices before assigning exclusionary discipline unless a student's presence in school poses a threat to safety; provides for appropriate due process, including for students with disabilities; and outlines classroom management and student discipline strategies, including the circumstances in which it is appropriate to request the involvement of an SRO or other law enforcement.

2. <u>Data Review</u>. The District will require staff to periodically review its discipline data and referrals to law enforcement to identify whether students of color are disciplined at disproportionate rates or more harshly than their white peers for similar conduct. The District will describe: who will conduct the review for each school and at the District-level; the methodology including what data will be collected and reviewed at each school (e.g., name of referring teacher, race/ethnicity of referring teacher); and how to identify similarly situated students.  The school-level review will be monthly and the District-level review will be quarterly.

3. <u>School-level Review</u>.  As part of a monthly review, each school will analyze classroom, grade, and school-level discipline data to ensure students of color are not disciplined more harshly than their similarly situated white peers; develop and implement plans to address any identified concerns; and coordinate professional development to remedy discriminatory practices and implement positive behavioral

supports.  Schools may recommend staff members to the Priority Staff Training Program described below.

4.  <u>District-level Review and Identification of Priority Staff and Schools</u>. By June 1, 2022, the District, with the assistance of its Consultant, will determine the criteria by which the District will identify staff members and schools that discipline students of color more harshly than their similarly situated white peers, including with referrals to law enforcement, and enroll those staff members and schools in the Priority Staff and School Assistance and Training Programs described below.  The District will also, as appropriate, identify other staff and schools and enroll them in these programs.  Staff and school training referrals will occur at least once each semester and the assigned training must be completed by the end of the school year.

5.  <u>Review of SRO and Law Enforcement Involvement</u>. On a quarterly basis, the District will review incidents in which an SRO or local law enforcement officer was asked to respond or did respond to school-based incidents and determine whether the involvement of law enforcement was appropriate based on Federal and state law requirements and the Student Code of Conduct, and whether the situation was handled in a manner consistent with District policy.  If the Director of OEO determines that the situation was not handled in accordance with such policy, the District will take appropriate remedial measures, which may include expunging the student's disciplinary records, providing the student with compensatory school work for the time missed from school, evaluating the placement of the SRO (if applicable), or conferring with or providing coaching or support for District or law enforcement personnel.

6.  <u>Protecting Students Subjected to Racial Harassment</u>.  When a student complains that racial harassment preceded or instigated a disciplinary incident, the District will consider the totality of the circumstances when considering appropriate disciplinary outcomes, including the impact that the alleged racial harassment or a racially hostile environment may have had on the student subjected to the harassment.  The District will respond to all allegations of racial harassment, including when the District becomes aware of harassment due to another disciplinary incident.

7.  <u>"Priority School" and "Priority Staff" Assistance and Training Program</u>. By June 1, 2022, the Consultant, in coordination with the District, will develop a technical assistance and training program for schools and staff identified by the District. The training program will begin in the 2022-2023 school year and require, at a minimum, 12 hours of training developed by the Director of OEO and the Consultant on non-discrimination in student discipline, implicit bias, and techniques for implementing culturally responsive, non-exclusionary disciplinary interventions.  The training will also require at least three one-on-one, 60-minute coaching sessions by the Consultant for Priority Staff or the building leader(s) at Priority Schools.

8.  <u>Appeal</u>. The District will establish a clear and consistent process for students and parents to appeal a school discipline decision.  The appeal process will include, at a minimum, a hearing officer, written notice of a right to appeal, and a hearing.

9.  <u>Developing Positive Behavior Supports</u>. The District will develop clear, concrete, and accessible strategies for classroom management and student discipline, including de-

escalation, conflict resolution, and positive behavioral strategies to improve classroom culture and climate.

c.  To address and remedy discriminatory access to student groups, the District Policy Revisions will, at a minimum, include proposed policies on:

1.  <u>Request and Review Procedure</u>.  The District will establish a clear and consistent process whereby students and parents may request to form student groups.  The District will inform students and parents to submit requests in writing to principals, who will review all requests within 30 days.  If an administrator denies a request or modifies the request, they will state the basis for the denial or alteration in writing. Students and parents may appeal a denial to the OEO.

2.  <u>Accountability</u>.  Administrators who deny or modify a student or parent request to form a student group will forward the original written request and any supporting documentation to the Director of OEO.  The Director of OEO, or a designee, will review each to ensure that the reason was appropriate and consistent with this Agreement and Federal law.  If the Director of OEO determines that a denial or alteration was inappropriate or unsupported, the District will grant the request and provide the administrator with additional training.

**For the Davis School District:**

JOHN ROBISON, Board of Education
President

REID NEWEY, Superintendent

Davis School District
45 E. State Street
P.O. Box 588
Farmington, UT 84025
(801) 402-5261

**For the United States of America:**

KRISTEN CLARKE
Assistant Attorney General

PAMELA S. KARLAN
Deputy Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS, Chief
WHITNEY M. PELLEGRINO, Principal Deputy
ARIA S. VAUGHAN, Trial Attorney
JADINE C. JOHNSON, Trial Attorney
United States Department of Justice
Civil Rights Division
Educational Opportunities Section
150 M Street NE
Washington, DC 20002
(202) 514-4092
Aria.Vaughan@usdoj.gov
Jadine.Johnson@usdoj.gov

ANDREA T. MARTINEZ
Acting United States Attorney
District of Utah

ANDREA T. MARTINEZ, Acting United States
Attorney
CARRA CADMAN, Assistant United States
Attorney
111 South Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 524-5682
Carra.Cadman@usdoj.gov

Date: 10/20/21

21

## APPENDIX A: OCTOBER 1 REPORT

The District will produce the following information to the United States by October 1 each year of the Agreement.  The District should upload all documents and data to the United States' electronic file sharing system (Justice Enterprise Filing System or JEFS).  Data should be provided in a sortable, searchable electronic format (e.g., Microsoft Excel spreadsheet or Access database).  Unless otherwise noted, the data and documents should be from the current school year.  The District may include additional information or documents for the United States' review.

| A-1. Student Information | (a) A master list of all students including each student's name, student ID, race/ethnicity, grade, and school. |
|---|---|
| A-2. Policies and Procedures | (a) All new or amended policies and procedures related to this Agreement not already produced to the United States, including amendments to student policies. |
| | (b) Procedures developed by the District to determine which student-on-student complaints should be investigated by a District Coordinator or School Coordinator (*see* Policy Addendum). |
| A-3. Staffing and Professional Development | (a) A list of all staff including each staff member's name, race/ethnicity, title, and assigned school(s) or site(s). |
| | (b) Names and race/ethnicity of the following staff members: (i) Director of the Office of Equal Opportunity; (ii) District Equal Opportunity Coordinators (District Coordinators); (iii) School Equal Opportunity Coordinators (School Coordinators) and their assigned schools; (iv) All staff in the Office of Equal Opportunity including a description of duties and whether staff review or oversee the central reporting system; and (v) Designated Assistant Superintendent described in Paragraph 25 of the Agreement. |
| | (c) Dates of materials from all relevant summer or fall orientation trainings including the topics covered, target audience, materials, handouts, PowerPoint presentation, and a list of staff who were required to, but did not attend the trainings. |
| A-4. Programs and Outreach | (a) Notices described in Paragraphs 27-30 and a list of and links to where the notices were posted or distributed. |
| | (b) Dates, locations, number of attendees, and topics discussed at the student and parent information sessions described in Paragraph 32.a. |
| | (c) Description of any District programs or initiatives intended to fulfill any terms of the Agreement. |
| A-5. Third-Party Consultant | (a) List of approved third-party Consultants, the executed Memorandum of Understanding, and a description of the specific responsibilities for which each Consultant is responsible, including references to the applicable paragraphs in this Agreement. |
| | (b) Potential needs for additional third-party Consultants and anticipated hiring schedule. |

## APPENDIX B: JULY 1 REPORT

The District will produce the following information to the United States by July 1 each year of the Agreement.  The District should upload all documents and data to the United States' electronic file sharing system (Justice Enterprise Filing System or JEFS).  Data should be provided in a sortable, searchable electronic format (e.g., Microsoft Excel spreadsheet or Access database). Unless otherwise noted, the data and documents should be from the school year that just ended. The District may include additional information or documents for the United States' review.

| B-1. Students & Student Groups | (a) A master list of all students including each student's name, student ID, race/ethnicity, grade, and school. |
|---|---|
| | (b) All requests to form student groups; whether the request was approved, denied, or approved with modifications; the reason for the decision; and a description of the OEO's[3] involvement. |
| | (c) Materials from all age-appropriate bullying and harassment intervention programs held in the past school year including: topics covered; names, race/ethnicity, and positions of facilitator(s); schools and grades served; handouts; PowerPoint presentations; and feedback forms (if any). |
| B-2. Central Reporting System | (a) All complaints of racial harassment or other racial discrimination in the central reporting system along with all supporting documentation for the entire school year, including the District's response. |
| | (b) A summary of the barriers identified by the District Coordinators to using the central reporting system (e.g., language barriers, internet access, technical difficulties, reluctance to submit forms online) and the steps taken to increase access to the system especially among underrepresented minority groups. |
| B-3. Staffing and Professional Development | (a) A list of all staff including each staff member's name, race/ethnicity, title, and assigned school(s) or site(s). |
| | (b) All materials related to staff referrals to the Department of Human Resources or ACT disciplinary committee for complaints of racial harassment or other racial discrimination, including the District's determination. |
| | (c) Materials from all relevant trainings held in the past school year and not included in the October report including the topics covered, target audience, handouts, PowerPoint presentations, list of individuals who did not attend, and feedback forms. |
| | (d) Materials from all relevant trainings for the upcoming school year including topics covered, target audience, handouts, PowerPoint presentations, and presenter(s). |

---

[3] For the 2021-2022 school year, the District should provide information about the OEO Committee and District Equity/OCR Compliance Officer's activities in lieu of the OEO and Director of OEO's activities.

| | |
|---|---|
| | (e) For the upcoming school year: designations of (i) Priority Schools and (ii) Priority Staff. |
| B-4. OEO Meetings | Agendas, notes, and materials from the following meetings: <br> (i)   Director of the Office of Equal Opportunity (OEO), District Equal Opportunity Coordinators, Consultant, and the Elementary and Secondary School Directors described in Paragraph 24 including the date, attendees, and action items (if any) for each meeting; <br> (ii)  Director of OEO, District Equal Opportunity Coordinators, Consultant, Director of Human Resources described in Paragraph 24 including the date, attendees, and action items (if any) for each meeting; and <br> (iii) Director of OEO, District Coordinators, and the designated Assistant Superintendent described in Paragraph 25 including the date, action items (if any), and required reporting for each meeting. |
| B-5. Student Discipline | (a) Disaggregated discipline data by name, student ID, race/ethnicity, grade, school, incident type, description of incident, date of incident, disciplinary outcome, the outcome's length of time, referring staff, and disciplining staff. |
| | (b) All discipline appeals or petitions with list of Appeal Board members and the District's decision. |
| B-6. Law Enforcement and SROs | (a) List of referrals to law enforcement by name, student ID, race/ethnicity, grade, school, incident type, description of incident, date of incident, disciplinary outcome, the outcome's length of time, referring staff, and explanation by referring staff explaining why law enforcement involvement was necessary. |
| | (b) List of investigations of complaints of racial harassment or other racial discrimination where an SRO was involved by name of SRO, race/ethnicity of SRO; name of complainant; name of student(s) subjected to the harassment or other discrimination; date(s) of incident; date of report; school; grade; description of incident; how the SRO became involved (if responding to a call, the name of the person who called the SRO); summary of SRO involvement; and outcome of the incident, including whether the student was referred to school administration, referred to law enforcement, or arrested. |
| B-7. Monitoring and Program Evaluation | (a) Based on District review of staff compliance and staff feedback from the past school year, a summary of additional training and support needs for the next school year. |
| | (b) Detailed results and findings from the student and parent surveys and student focus groups, recommended next steps to the School Board, and the School Board's plan to implement the recommendations. |
| | (c) All Consultant reports or findings not already produced. |

**APPENDIX C: DUTIES OF DISTRICT EQUAL OPPORTUNITY COORDINATORS AND SCHOOL EQUAL OPPORTUNITY COORDINATORS**

| | District Coordinators | School Coordinators |
|---|---|---|
| **General (Par. 13, 15)** | - At least 3 District Coordinators<br>- Based in OEO<br>- Full-time position (1.0 FTE) | - At least 30 School Coordinators<br>- Based in local schools and in addition to general job duties<br>- Receive annual stipend from the District<br>- Serve for at least two years |
| **Student-on-student complaints (Par. 14-15)** | *The District will develop procedures to determine which student-on-student complaints should be investigated by a District Coordinator or a School Coordinator.* | |
| | District Coordinators will investigate student-on-student complaints of racial harassment and other racial discrimination, including the discriminatory administration of discipline involving, at a minimum:<br>- Recurring student subjected to the racial harassment or other discrimination;<br>- Recurring student alleged to have engaged in harassment;<br>- Complaints of physical harm;<br>- Threat of physical harm; and<br>- Allegations of non-harassment forms of discrimination against the School Coordinator, the Principal, Assistant Principal, Administrative Intern, or another District Coordinator | School Coordinators will investigate and respond to all complaints of student-on-student racial harassment and other racial discrimination, including the discriminatory administration of discipline, not elevated to the District Coordinators<br>- Each Elementary School Coordinator will be responsible for no more than 4 elementary schools<br>- Each Secondary School Coordinator will be responsible for no more than 3 junior high or 2 high schools |
| **Staff-on-student complaints (Par. 14)** | District Coordinators and the Director of OEO will collaborate with the Department of Human Resources and the ACT disciplinary committee to ensure the District follows the proper procedures, including recording information in the central reporting system | School Coordinators will not be involved in investigations of staff-on-student complaints |
| **Responding to Complaints (Par. 20, 22, 57.a.10)** | Within 2 days of receipt of a complaint, if primary investigator, will, at minimum, determine if interim safety measures are necessary and put them in place<br><br>Within 10 days of receipt of a complaint, if primary investigator, will, at minimum:<br>- Enter a detailed summary of actions taken in response to the complaint<br>- Receive automated copies of every complaint filed in the central reporting/case management system; and<br>- Oversee all complaints filed in the system and coordinate with other compliance officers on complaints that allege harassment or discrimination based on race and another protected class | Within 2 days of receipt of a complaint, if primary investigator, will, at minimum, determine if interim safety measures are necessary and put them in place<br><br>Within 10 days of receipt of a complaint, will, at minimum, enter a detailed summary of actions taken in response to the complaint |

25

| | | |
|---|---|---|
| **District meetings (Par. 24-25)** | Meet monthly during Year 1 and quarterly thereafter with the Director of OEO, Consultant, and the Elementary and Secondary School Directors and Director of Human Resources (separately) to discuss topics outlined in Par. 24<br><br>Meet monthly during Year 1 and quarterly thereafter with the OEO Director and Assistant Superintendent to assess District progress with implementing terms of Agreement | |
| **Culture, Climate, & Community Engagement (Par. 32.a, 37-38)** | Assist the Elementary and Secondary School Directors with hosting parent and community outreach events<br><br>Analyze the results of the annual surveys with the Director of OEO and incorporate analysis into the annual Effectiveness Assessment Report<br><br>Analyze results of focus group findings with Director of OEO and incorporate analysis into the annual Effectiveness Assessment Report | |
| **Monitoring & Reporting (Par. 48-49, 52-53, 57.a.13)** | General monitoring duties:<br>- Monitor compliance with the Agreement<br>- Coordinate the District's submission of reports to the United States, including responses to requests for information, interview requests, and scheduling onsite visits<br>- Assist with hiring necessary Consultants and training facilitators<br>- Oversee the District's implementation of specific terms of this Agreement<br><br>Specific monitoring duties:<br>- Create quarterly reports for the meetings with the Director of OEO and Assistant Superintendent<br>- Regularly assess the complaint portal to ensure there are no barriers to using the system (e.g., language and accessibility barriers, internet access, technical difficulties, privacy and retaliation concerns, or distrust or other reluctance to submit forms online) and propose ways to increase access<br>- Review disciplinary practices to reduce discriminatory practices and promote equitable implementation<br>- Work with Director of OEO and Consultant to create the Longitudinal Effectiveness Assessment Report starting in July 2023 | Monitor the effectiveness of assigned schools' response to harassment complaints and recommend additional remedies where a response is ineffective |